STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. DARRYL DAVIS, A/K/A HENRY DAVIS, DEFENDANT-RESPONDENT.

Argued September 9, 1986—Decided November 19, 1986.

*Steven J. Kaflowitz,* Assistant Prosecutor, argued the cause for appellant (*John H. Stamler,* Union County Prosecutor, attorney).

*Bernadette De Castro,* Assistant Deputy Public Defender, argued the cause for respondent (*Alfred A. Slocum,* Public Defender, attorney; *Bernadette De Castro* and *Corinne F. Clarke,* Assistant Deputy Public Defender, on the briefs).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal concerns the sensitive issue of investigatory stops of private citizens by police officers. Specifically, the issue here is whether, under the circumstances of this case, a police officer's stopping and questioning of defendant was constitutional under the fourth amendment of the Federal Constitution and Article I, paragraph 7 of the New Jersey Constitution. Defendant, Henry Davis, indicted for burglary, *N.J.S.A.* 2C:18-2, and theft, *N.J.S.A.* 2C:20-3, moved to suppress the evidence seized from him on the grounds that it was the subject of an illegal search and seizure. The trial court granted Davis' motion to suppress and the Appellate Division denied the State leave to appeal the interlocutory order. Pursuant to Rule 2:2-2(b), we granted the State leave to appeal the interlocutory order, 102 *N.J.* 401, (1986), and now reverse the order suppressing the evidence.

I

The only witness to testify at the suppression hearing was Police Officer John D'Andrea, a 14-year member of the Springfield Police Department. He testified that at approximately 11:45 P.M. on May 25, 1985, while on patrol, he received a radio dispatch from the desk sergeant "detailing" him to investigate a telephone call from a member of the Springfield First Aid Squad who said he had observed two individuals [1] "hanging around" a closed Exxon gasoline station located at the intersection of Morris Avenue and Caldwell Place in Springfield.[2]

---

[1] The second individual was later indentified as Xavier Christian. He was also indicted, but pled guilty prior to the motion to suppress.

[2] The report of the desk officer, Sgt. Vernon Pederson, indicates that he "received a call from a member of [the] F.A.S. on his way home from [the] Squad House he [*sic*] observed two males on bikes pull into Exxon station, Morris/Caldwell, same appeared suspicious to him."

Lieutenant Kennedy, also of the Springfield Police Department, arrived at the Exxon station before D'Andrea. Having found no one at the station, Kennedy instructed Officer D'Andrea to drive up Morris Avenue to search for the two suspects. Approximately three blocks from the station, Officer D'Andrea observed two individuals on bicycles "driving against vehicular traffic on the left side of the roadway." He approached them from behind and made a left turn into a street in front of them in order to impede their path. He did not put on his lights or siren. The following excerpts from the hearing transcript relate Officer D'Andrea's version of events that transpired after the stop:

I asked them if they were at the Exxon station and they stated yes. I asked them what their purpose was at the Exxon station and they said they ran out of gas further up the road. They were looking for a gas station that was open. They were at the Exxon station and it was closed and they got a gas container.

At that time they were holding an Exxon empty anti-freeze bottle[3] and they needed gas container because the gas station, Mobile station would not sell them gas unless they had a container to put the gas in.

The Mobile station is located on Morris and Millburn. They were driving to that area on their bicycles. That's other end of Morris Avenue in Millburn. At that time I asked them what were they doing with bicycles if they ran out of gas. They stated that the bicycles were in the trunk of the car. I asked them what kind of car they had and where it was. They weren't sure—they couldn't remember where the car was and they said the bicycles were in the trunk of the 280Z, Datsun. They stated the two bicycles, one was a ten speed and one was a three speed. They said they had bicycle racks on the back.

At that time I asked them for their identification and they did not produce any. I asked them what their names were and one was a Darryl Davis and the other was Williams. I forget what first name he gave me.

I asked them for identification. Mr. Williams at that time he was identified as Mr. Williams, gave me a registration. They said this was to the vehicle. The registration he gave me was to a 1980 Ford, to a Mr. Sunday Ajayum from East Orange.

I asked him how did he get this registration to Mr. Ajayum's car. He stated that was his brother. He also stated that was the car he was driving. I asked them if they had any drivers' license. They said no.

---

[3] It is not clear from the record when Officer D'Andrea first noticed the Exxon empty anti-freeze container.

I asked for drivers' license. Mr. Davis stated that he left his driver's license in the vehicle at the location, which they were not sure of where the car was. At that time I got out of the police car after I radioed what information I had. I got out of the police car. At that time I noticed that the three speed bicycle had a Summit registration bike tag, a number of which I'd have to check my report. I don't remember offhand.

At that time I conducted a pat down search[4] of both subjects and found a set of car keys and I'd have to check the report, which subject with the car keys were in. He stated those belonged to the car and they were his brother's.

While waiting for the back-up units to arrive at the scene, Officer D'Andrea radioed the desk sergeant and asked him to telephone the Summit Police Department to determine whether any bicycles had been reported stolen. At this point, both individuals admitted that the bikes were stolen. Officer D'Andrea testified that it was possible that this admission was a response to the radio transmission, which was made within earshot of the suspects.

The trial court did not doubt Officer D'Andrea's credibility and concluded that all of the officer's conduct after the initial stop was valid. Nevertheless, the trial court granted defendant's motion to suppress the stolen bicycles, because the court never heard the officer specifically use the word "suspicious" in articulating his reasons for stopping the two individuals.[5] Hence, the court concluded that Officer D'Andrea had no

---

[4]Officer D'Andrea explained his reason for conducting the pat-down search as follows:

It was about quarter to 12 at night. The information I received from both subjects with their identification was not very substantial. At that time I couldn't figure out who was who, where they were from, they didn't know where the car was that was broken down.

They were looking for a gas station on bicycles, with one of the bicycles had [sic] a Summit registration tag, which was located a half mile from [the] Summit borderline at that point where I stopped them. I felt that warranted for my personal safety that I conduct a pat down search on the subjects.

[5]The trial court stated:

The failure of the case is based on the fact that no one said to me in this courtroom that there was a call of two people acting suspiciously in a gas station. Being in a gas station these days is no crime.

articulable suspicion to make the initial stop. The State limited its appeal to the validity of the initial stop and interrogation of the defendant. For if the initial stop violated constitutional standards, the defendant's subsequent confession, his arrest and the seizure of the bicycles by the police were tainted by the unconstitutionality of the stop.

## II

There are a myriad of daily street encounters between citizens and police that are initiated by the police for a wide variety of purposes, ranging from friendly exchanges to hostile confrontations. Not all such encounters constitute "seizures" within the purview of the fourth amendment. Our first inquiry, therefore, is whether Officer D'Andrea's stop of defendant constituted such a "seizure."

The police do not violate the fourth amendment by "merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering as evidence in a criminal prosecution his voluntary answers to such questions." *Florida v. Royer,* 460 *U.S.* 491, 497, 103 *S.Ct.* 1319, 1324, 75 *L.Ed.*2d 229, 236 (1983); *see also State v. Sheffield,* 62 *N.J.* 441, 447, (1973) ("[M]ere field interrogation, without more, by a police officer does not involve 'detention' in the constitutional sense so long as the officer does not deny the individual the right to move.").[6]

---

[6]Professor Lafave, in his treatise on the fourth amendment, asserts that "the critical inquiry would be whether the policeman, although perhaps making inquiries which a private citizen would not be expected to make, has otherwise conducted himself in a manner consistent with what would be viewed as a nonoffensive contact if it occurred between two ordinary citizens." W.R. Lafave, 3 *Search and Seizure,* § 9.2 at 53. Thus, an officer would not be deemed to have seized another if his questions were put in a conversational manner, if he did not make demands or issue orders, and if his questions were not overbearing or harassing in nature. *Id.* at 53–54.

Nonetheless, "[i]t is recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry v. Ohio,* 392 *U.S.* 1, 16, 88 S.Ct. 1868, 1877, 20 *L.Ed.*2d 889, 903 (1968); *see also INS v. Delgado,* 466 *U.S.* 210, 215, 104 *S.Ct.* 1758, 1762, 80 *L.Ed.*2d 247, 255 (1984) (quoting *United States v. Mendenhall,* 446 *U.S.* 544, 554, 100 S.Ct. 1870, 1877, 64 *L.Ed.*2d 497, 509 (1980)) ("[A]n initially consensual encounter between a police officer and a citizen can be transformed into a seizure ... if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.")

The State contends that it is objectively reasonable to infer from the totality of circumstances surrounding this incident that when stopped by Officer D'Andrea, defendant and his companion were free to leave. We disagree. Officer D'Andrea testified that he stopped defendant by blocking his path with his patrol car. Moreover, he testified on cross-examination that the defendant and his companion were not free to leave because he "was conducting somewhat of an investigation, [to] find out what their purpose was for being in that area."

■ In *Terry v. Ohio, supra,* 392 *U.S.* at 19, 88 *S.Ct.* at 1878, 20 *L.Ed.*2d at 904, the Court specifically rejected the notions that "the Fourth Amendment does not come into play at all as a limitation upon police conduct if the officers stop short of something called a 'technical arrest'...."; *see also United States v. Brignoni-Ponce,* 422 *U.S.* 873, 878, 95 *S.Ct.* 2574, 2578, 45 *L.Ed.*2d 607, 614 (1975) ("The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest.") Therefore, we conclude that Officer D'Andrea's detention of the defendant constituted a "seizure" within the purview of the fourth amendment.

■ The fourth amendment and Article I, paragraph 7 of the New Jersey Constitution are not guarantees against all searches and seizures but against only those that are unreason-

able. *See United States v. Sharpe,* 470 *U.S.* 675, 682, 105 *S.Ct.* 1568, 1573, 84 *L.Ed.*2d 605, 613 (1985); *State v. Bruzzese,* 94 *N.J.* 210, 217 (1983). Prior to the Court's landmark decision in *Terry v. Ohio, supra,* 392 *U.S.* 1, 88 *S.Ct.* 1868, 20 *L.Ed.*2d 889, any restraint of a person without probable cause constituted an unconstitutional seizure under the fourth amendment. *See Dunaway v. New York,* 442 *U.S.* 200, 208, 99 *S.Ct.* 2248, 2254, 60 *L.Ed.*2d 824, 832–33 (1979). In *Terry,* the Court for the first time recognized that "seizures" without probable cause were permissible in limited circumstances. Our inquiry, therefore, is whether Officer D'Andrea's conduct falls within the limited exception created by *Terry* and its progeny.

In *Terry,* a police officer who had been on the police force 39 years and had been a detective for 35 years, observed three men repeatedly look into a store, and concluded that they were about to commit a robbery. He approached the men, identified himself as a police officer, and asked them for their names. After receiving a mumbled reply, the officer conducted a patdown search of the three men, finding two weapons. In analyzing the constitutionality of this seizure, the Court examined "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." 392 *U.S.* at 20, 88 *S.Ct.* at 1879, 20 *L.Ed.*2d at 905.

The Court rejected a standard requiring probable cause as a predicate for brief investigative seizures, choosing instead a test that balanced " 'the need to search [or seize] against the invasion which the search [or seizure] entails.' " *Id.* at 21, 88 *S.Ct.* at 1879, 20 *L.Ed.*2d at 905–06 (quoting *Camara v. Municipal Court,* 387 *U.S.* 523, 534–35, 536–37, 87 *S.Ct.* 1727, 1733–35, 18 *L.Ed.*2d 930, 938–40 (1967)). It recognized that effective crime prevention and detection is the general underlying governmental interest that permits a police officer in appropriate circumstances and in an appropriate manner, but without probable cause, to intrude upon the constitutionally protected interests of

a private citizen to investigate possible criminal behavior. This general governmental interest is sufficient to justify a particular intrusion, however, only when the police officer can "point to specific and articulable facts, which *taken together with rational inferences from those facts*, reasonably warrant that intrusion" *Id.* at 21, 88 *S.Ct.* at 1880, 20 *L.Ed.*2d at 906 (emphasis added). Moreover, such facts must "be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Id.* at 21–22, 88 *S.Ct.* at 1880, 20 *L.Ed.* at 906.

The Supreme Court in *Terry* upheld the search on narrow grounds [7] and expressly declined to address the constitutional propriety of an "investigative 'seizure' upon less than probable cause for purposes of 'detention' and/or interrogation." *Id.* at 19 n. 16, 88 *S.Ct.* at 1879 n. 16, 20 *L.Ed.*2d at 905 n. 16. Only in subsequent cases did the Court extend the *Terry* doctrine to include investigatory stops by police. This development is reviewed in *United States v. Cortez*, 449 *U.S.* 411, 417–18, 101 *S.Ct.* 690, 694–95, 66 *L.Ed.*2d 621, 628–29 (1981), as follows:

An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity. Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like "articulable

---

[7]We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled to the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may be properly introduced in evidence against the person from whom they were taken.

[*Terry v. Ohio, supra*, 392 *U.S.* at 30–31, 88 *S.Ct.* at 1884–85, 20 *L.Ed.*2d at 911.]

reasons" and "founded suspicion" are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account. *Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.*

[ (Footnote and citations omitted, emphasis added).]

In *Cortez,* the Court set forth a two-step analysis for determining whether the totality of circumstances creates a "particularized suspicion." A court must first consider the officer's objective observations. The evidence collected by the officer is "seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Id.* at 418, 101 *S.Ct.* at 695, 66 *L.Ed.*2d at 629. "[A] trained police officer draws inferences and makes deductions ... that might well elude an untrained person. The process does not deal with hard certainties, but with probabilities." *Id.* at 418, 101 *S.Ct.* at 695, 66 *L.Ed.*2d at 629. Second, a court must determine whether the evidence "raise[s] a suspicion that the particular individual being stopped is engaged in wrongdoing." *Id.* at 418, 101 *S.Ct.* at 695, 66 *L.Ed.*2d at 629. *Accord Michigan v. Summers,* 452 *U.S.* 692, 696–701, 101 *S.Ct.* 2587, 2590–94, 69 *L.Ed.*2d 340, 345–49 (1981); *Brown v. Texas,* 443 *U.S.* 47, 50–51, 99 *S.Ct.* 2637, 2640–41, 61 *L.Ed.*2d 357, 361–62 (1979); *Delaware v. Prouse,* 440 *U.S.* 648, 661, 99 *S.Ct.* 1391, 1400, 59 *L.Ed.*2d 660, 672 (1979); *United States v. Brignoni-Ponce, supra,* 422 *U.S.* at 878–82, 95 *S.Ct.* at 2578–81, 45 *L.Ed.* 2d at 614–17; *Adams v. Williams,* 407 *U.S.* 143, 146–49, 92 *S.Ct.* 1921, 1923–25, 32 *L.Ed.* 612, 617–18 (1972).

While this standard involves a significantly lower degree of objective evidentiary justification than does the probable cause test, it is clear that:

*Terry* and its progeny nevertheless created only limited exceptions to the general rule that seizures of the person require probable cause to arrest. Detentions may be "investigative" yet violative of the Fourth Amendment absent probable cause.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

"The scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." The reasonableness requirement of the Fourth Amendment requires no less when the police action is a seizure permitted on less than probable cause because of the legitimate law enforcement interests. The scope of the detention must be carefully tailored to its underlying justification. [*Florida v. Royer, supra,* 460 *U.S.* at 499–500, 103 *S.Ct.* at 1325, 75 *L.Ed.*2d at 237–38 (quoting *Terry v. Ohio, supra,* 392 *U.S.* at 19, 88 *S.Ct.* at 1878, 20 *L.Ed.*2d at 889) (citations omitted).]

Recognizing that there is no litmus-paper test for determining when a seizure exceeds the bounds of an investigative stop, the Court proceeded to set forth general guidelines for determining whether an investigatory stop is unconstitutional:

The predicate permitting seizures on suspicion short of probable cause is that law enforcement interests warrant a limited intrusion on the personal security of the suspect. The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.
[*Id.* at 500, 103 *S.Ct.* at 1325, 75 *L.Ed.*2d at 38 (citations omitted).]

### III

■ We recognize that Article I, paragraph 7 of the New Jersey Constitution may give greater protection against unreasonable searches and seizures than the fourth amendment. *See State v. Bruzzese, supra,* 94 *N.J.* at 216; *State v. Hunt,* 91 *N.J.* 338, 344–46 (1982); *State v. Alston,* 88 *N.J.* 211, 225 (1981); *State v. Johnson,* 68 *N.J.* 349, 353 (1975). We find, however, that no such enhanced protection is provided by our Constitution under the facts of this case. *See State v. Sheffield, supra,* 62 *N.J.* 441.

Article I, paragraph 7 of the New Jersey Constitution "does not speak in absolute terms but strikes a balance between the interests of the individual in being free of police interference and the interests of society in effective law enforcement." *State v. Dilley,* 49 *N.J.* 460, 468 (1967). In determining the

reasonableness of the seizure, we therefore weigh the public interest served against the nature and scope of the intrusion upon the individual.

New Jersey has long recognized that a temporary street-detention based on less than probable cause may be constitutional. In a pre-*Terry* decision, we recognized that a police officer's duties include vital preventive roles and that reason and common sense dictate "he should clearly have the right to stop persons on the street for summary inquiry where, as here, the circumstances are so highly suspicious as to call for such an inquiry." *State v. Dilley, supra,* 49 *N.J.* at 464. In determining the reasonableness of the detention, we concluded that all factors must be balanced, including the basis of suspicion on the part of the police officer and the nature and extent of the restraint on the individual. "Where, as here, the circumstances disclosed *highly suspicious* activities at three in the morning * * * the inquiry was not only reasonably called for but was actually dictated by elemental police responsibilities." *Id.* at 468 (emphasis added).

In a subsequent case, we rejected a requirement that a seizure initially limited to questioning could be deemed constitutional only if the situation involved "highly suspicious activities." *State v. Sheffield, supra,* 62 *N.J.* at 446. We reasoned that:

> [a] police officer charged with the duty of crime prevention and detection of the public safety must deal with a rich diversity of street encounters with citizens. In a given situation, even though a citizen's behavior does not reach the level of "highly suspicious activities," the officer's experience may indicate that some investigation is in order. Depending on the circumstances, street interrogation may be most reasonable and proper.
>
> [*Id.*] [citation omitted]

The crucial inquiry was whether the conduct of the police officer was "overbearing or harassing in nature," *Id.* at 447. We noted that the officer's training and experience "should not be given [mere] grudging recognition when assaving the existence of cause to take police action." *Id.* at 445. As we pointed out in *State v. Gray,* 59 *N.J.* 563, 567–68 (1971):

police officers are trained in the prevention and detection of crime. Events which would go unnoticed by a layman ofttimes serve as an indication to the trained eye that something amiss might be taking place or is about to take place. The police would be derelict in their duties if they did not investigate such events.

 In sum, to determine the lawfulness of a given seizure under New Jersey law, it is incumbent upon a reviewing court to evaluate the totality of circumstances surrounding the police-citizen encounter, balancing the State's interest in effective law enforcement against the individual's right to be protected from unwarranted and/or overbearing police intrusions. An investigatory stop is valid only if the officer has a "particularized suspicion" based upon an objective observation that the person stopped has been or is about to engage in criminal wrongdoing. The "articulable reasons" or "particularized suspicion" of criminal activity must be based upon the law enforcement officer's assessment of the totality of circumstances with which he is faced. Such observations are those that, in view of officer's experience and knowledge, taken together with rational inferences drawn from those facts, reasonable warrant the limited intrusion upon the individual's freedom.

 Moreover, even if the initial stop is deemed constitutional, a further inquiry must be made to determine whether the subsequent scope of the seizure was justified by the particular facts and circumstances of the case. An important factor to consider is whether the officer used the least intrusive investigative techniques reasonably available to verify or dispel his suspicion in the shortest period of time reasonably possible.[8]

 We recognize, as did the Supreme Court in *Terry* and its progeny, the narrow line that must be drawn to protect a

---

[8]In *United States v. Sharpe*, 470 *U.S.* 675, 685, 105 *S.Ct.* 1568, 1575, 84 *L.Ed.* 2d 605, 615 (1985), the Supreme Court rejected a bright-line rule concerning the length of a detention to determine the reasonableness of a given police intrusion: "Much as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria."

citizen's privacy and freedom of movement and yet allow proper law-enforcement activities. We have always favored strong safeguards against governmental interference with a citizen's rights of privacy and freedom. Common sense and good judgment nevertheless require that police officers be allowed to engage in some investigative street encounters without probable cause. Such encounters are justified only if the evidence, when interpreted in an objectively reasonable manner, shows that the encounter was preceded by activity that would lead a reasonable police officer to have an articulable suspicion that criminal activity had occurred or would shortly occur. No mathematical formula exists for deciding whether the totality of circumstances provided the officer with an articulable or particularized suspicion that the individual in question was involved in criminal activity. Such a determination can be made only through a sensitive appraisal of the circumstances in each case. In each case, the reasons for such particularized suspicion will be given careful scrutiny by the Court. A seizure *cannot*—we emphasize *cannot*—be justified merely by a police officer's subjective hunch.

## IV

We now examine the conduct of Officer D'Andrea to determine whether his seizure of defendant was reasonable, both at its inception and as it was conducted. Considering the justification for its inception, we must examine the knowledge Officer D'Andrea possessed when he seized the defendant and any reasonable inferences that can be drawn from his knowledge. We find that the attendant circumstances were sufficient to justify Officer D'Andrea stopping and questioning the defendant. In fact, based on the totality of the circumstances, Officer D'Andrea might well have been derelict in his duties had he not stopped and questioned the defendant.

Officer D'Andrea stopped defendant and his companion on the basis of a radio dispatch, the gist of which was that a

member of the Springfield First Aid Squad had telephoned headquarters and reported that two individuals were "hanging around" a closed gasoline service station at midnight. Usually the reliability of anonymous informers, who are themselves criminals in many instances, must be established. Different considerations obtain, however, when the informer is an ordinary citizen. There is an assumption grounded in common experience that such a person is motivated by factors that are consistent with law enforcement goals. Consequently, "an individual of this kind may be regarded as trustworthy and information imparted by him to a policeman concerning a criminal event would not especially entail further exploration or verification of his personal credibility or reliability before appropriate police action is taken." *State v. Lakomy*, 126 *N.J. Super.* 430, 435 (App.Div.1974); *accord State v. Kurland*, 130 *N.J. Super.* 110, 114–15 (App.Div.1974).

■ Here, the informer is more than the ordinary citizen—he is a member of the Springfield First Aid Squad, an individual who, while not part of the government, is more involved and presumably more public spirited than the average citizen. The police could therefore rely on him as a credible source of information. The report from a member of the First Aid Squad that two men were "hanging around" a closed Exxon Station at midnight furnished sufficient basis for the police to investigate whether criminal activity had occurred or was about to occur. Indeed, the police department would have been delinquent in its duty to prevent crime and protect the public if it had ignored the call.

■ Officer D'Andrea, therefore, in response to a radio dispatch from a credible informer drove to the gas station to investigate. His superior arrived at the station before he did and, finding no one at the station, directed Officer D'Andrea to drive up Morris Avenue looking for two men. Minutes thereafter, approximately three blocks from the Exxon Station, Officer D'Andrea observed two men, the defendant and his

companion, driving bicycles at twelve o'clock at night. The totality of the circumstances in this case—the credibility of the informer, the circumstances described by the informer, two men "hanging around" a closed Exxon Station at midnight and the uncommon sight of two men driving bicycles at midnight in close proximity to the Exxon Station—were sufficient for Officer D'Andrea, acting as an objective police officer, to rationally suspect that the defendant and his companion were the two men observed by the closed Exxon Station. More importantly, such circumstances were sufficient evidence for the officer to have a "particularized suspicion" that the defendant may have been engaged in criminal activity to justify his initial unintrusive stopping of the defendant.

Having determined that the stop was reasonably initiated, we must now examine the manner in which the stop and questioning were conducted. The fourth amendment "proceeds as much by limitations upon the scope of governmental action as by imposing preconditions upon its initiation." *Terry v. Ohio, supra,* 392 *U.S.* at 28–29, 88 *S.Ct.* at 1883–84, 20 *L.Ed.*2d at 910.

Once Officer D'Andrea stopped the individuals, he acted by using reasonably unintrusive investigative techniques in a manner calculated to either verify or dispel his suspicions in a short period of time. He asked questions limited to the circumstances surrounding their presence at the gas station. Officer D'Andrea merely sought to ascertain if defendant and his companion had been "hanging around" the closed gas station at approximately midnight, as reported by a first aid squad member, and, if so, what they had been doing there. "Especially during the hours of darkness, the police will have a sufficient basis to stop in order to investigate whether a burglary of a closed commercial establishment is pending or had occurred when the suspect is seen in such close proximity to that establishment that he appears to be something other than a mere passerby." W.R. LaFave, 3 *Search and Seizure* § 9.3 at

72 (1978). *See also State v. Dilley, supra,* 49 *N.J.* 460 (police had grounds to stop two men who acted suspiciously in a municipal parking lot at 3 A.M.).

As the questioning unfolded, Officer D'Andrea received answers that tended to strengthen his suspicions that the suspects were up to no good. For defendant and his compatriot not only failed miserably to dispel the officer's suspicions, they effectively talked themselves into the arrest at issue.

Officer D'Andrea, as a reasonable police officer, could not have allowed defendant and his companion to pass, without, at the very least, asking them if they had been at the gas station, and, if so, why. He conducted the stop and the questioning in an efficient and unobtrusive manner. Hence, we conclude his conduct in stopping and questioning the defendant was reasonable and did not violate defendant's rights under the fourth amendment and Article I, paragraph 7 of the New Jersey Constitution to be free of unreasonable searches and seizures.

The order suppressing the seizure of the bicycles is reversed and the matter remanded to the trial court for further proceedings.

*For reversal and remandment*—Chief Justice WILENTZ, Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.