753 A.2d 746

THE STATE OF NEW JERSEY, PLAINTIFF v. GREGORY
R. GAVAZZI, SAMUEL T. REIFF, DEFENDANTS.

Superior Court of New Jersey
Law Division
Passaic County

Decided January 25, 2000.

*Ronald S. Fava,* Passaic County Prosecutor, attorney for plaintiff (*Mark H. Ranges,* Assistant Prosecutor appearing and *Sumana Mitra,* Assistant Prosecutor on the brief).

*Cella, Goldstein & Douglas,* attorneys for defendant Gregory Gavazzi (*Jerome M. Douglas,* appearing and on the brief).

*Leonard J. Carafa,* attorney for defendant Samuel T. Reiff.

DeLUCCIA, J.S.C.

Shortly before 8:55 p.m. on the evening of April 22, 1999, the domestic tranquility of Boris and Jolan Turchick was interrupted by a masked intruder who entered their home and robbed Mrs. Turchick of her handbag at knife point. After the intruder fled, the victims reported the robbery to the Wanaque Police. A limited description of the assailant was broadcast to Detective Sergeant Norton and Detective Cavallaro who were in the vicinity on an unrelated investigation. The police radio broadcast of the home invasion robbery at the Turchicks' residence only identified a single assailant and failed to mention the involvement of an automobile. Mrs. Turchick described her assailant as a "tall man, wearing a dark colored ski mask, a white sweater and dark colored pants."

According to the testimony of Det. Sgt. Norton, he and his partner began checking the immediate area of the incident, which he described as residential or "rural." Norton observed a dark colored vehicle traveling south on 4th Avenue, in a direction away from the Turchicks' residence. This was the only car encountered

by the police that evening. There were two occupants in the vehicle, the driver and a front seat passenger wearing a "white shirt." This observation was made approximately three blocks from the Turchicks' residence.

At 9:01 p.m., Norton conducted a motor vehicle stop on 4th Avenue and the Boulevard. According to Norton, upon approaching the vehicle, he identified the driver as Gregory Gavazzi, and Cavallaro identified the front seat passenger as Samuel Reiff. Both defendants resided in the Borough of Wanaque. Norton testified that Cavallaro observed a large black bag on the floor of the passenger side of the vehicle. The police report indicated the bag was between the legs of defendant Reiff. Cavallaro asked Reiff who owned the handbag. According to Norton, Reiff claimed that he did not know since the bag was in the car upon his entry. The police report indicated that since Mrs. Turchick's assailant was reportedly armed with a knife, the defendants were ordered to exit the vehicle and lie face down on the ground for the safety of the officers. The handbag was retrieved from defendant's vehicle. Upon an examination, it was identified as belonging to Mrs. Turchick. The defendants were immediately placed under arrest.

While in custody, the police obtained a search warrant for Gavazzi's vehicle and also obtained statements from the defendants. Based upon this factual complex, the defendants now move the court to suppress the evidence seized both with and without the benefit of the search warrant as well as the statements obtained from defendants while in custody.

Encounters between the police and citizens may or may not require constitutional justification depending upon the surrounding circumstances. Not all encounters between police and citizens constitute seizures. *State v. Davis*, 104 *N.J.* 490, 497, 517 *A.*2d 859 (1986). Some street interrogations or field inquiries may be initiated by the police without a particularized suspicion that the person stopped has been or is about to engage in criminal wrongdoing. *State v. Alexander*, 191 *N.J.Super.* 573, 576, 468 *A.*2d

713 (App.Div.1983), *cert. denied,* 96 *N.J.* 267, 475 *A.*2d 570 (1984). Police may conduct a motor vehicle stop in the exercise of general community caretaking responsibilities, where no criminal behavior or motor vehicle violation is suspected. *See State v. Goetaski,* 209 *N.J.Super.* 362, 366, 507 *A.*2d 751 (App.Div.1986). However, such stops are to be "totally divorced from the detection, investigation or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski,* 413 *U.S.* 433, 441, 93 *S.Ct.* 2523, 2528, 37 *L.Ed.*2d 706, 714–715 (1973).

 The police may also conduct brief investigative seizures without a formal arrest and without probable cause. *Terry v. Ohio,* 392 *U.S.* 1, 21, 88 *S.Ct.* 1868, 1879, 20 *L.Ed.*2d 889, 905–906 (1968); *State v. Davis, supra,* 104 *N.J.* at 499, 517 *A.*2d 859. However, prior to instituting an investigative seizure, the police are required to articulate "a 'particularized suspicion' based upon an objective observation that the person stopped has been or is about to engage in criminal wrongdoing." *State v. Davis, supra,* 104 *N.J.* at 504, 517·*A.*2d 859. Our courts have defined a seizure as a situation in which made the totality of the circumstances " 'a reasonable person would have believed that he was not free to leave.' " *State v. Tucker,* 136 *N.J.* 158, 164, 642 *A.*2d 401 (1994) (citing *State v. Davis, supra,* 104 *N.J.* at 498, 517 *A.*2d 859.)

 The third situation involving police and citizen encounters in which a seizure is effected is an arrest supported by probable cause. Probable cause is defined as a reasonable basis for a belief that a crime has been or is being committed. *See State v. Burnett,* 42 *N.J.* 377, 386, 201 *A.*2d 39 (1964). Probable cause is a mercurial concept incapable of precise definition. "It is more than mere naked suspicion but less than the legal evidence necessary to convict... it is not a technical concept but rather one having to do with 'the factual and practical considerations of everyday life' upon which reasonable men, not constitutional lawyers, act." (citation omitted) *State v. Waltz,* 61 *N.J.* 83, 87, 293 *A.*2d 167 (1972).

■ The discussion of the issue raised by defendants precedes from the conclusion that when the police stopped the defendants' vehicle, they were seized within the meaning of the Fourth Amendment of the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution. *See State v. Seymour*, 289 *N.J.Super.* 80, 84, 672 *A.*2d 1273 (App.Div.1996). As previously noted, brief investigative seizures do not require the traditional probable cause generally associated with formal arrests. *Terry v. Ohio, supra; State v. Davis, supra*, 104 *N.J.* at 499, 517 *A.*2d 859. Accordingly in this case, police were required to demonstrate a particularized suspicion based upon objective observations that the defendants had been or were about to engage in criminal wrongdoing. *State v. Davis, supra*, 104 *N.J.* at 504, 517 *A.*2d 859.

■ There is no bright line test to determine whether the police have acted within constitutional bounds in conducting a *Terry* type investigatory stop. In *State v. Davis, supra*, our Supreme Court relied upon the two-step analysis established by the United States Supreme Court in *United States v. Cortez*, 449 *U.S.* 411, 418, 101 *S.Ct.* 690, 695, 66 *L.Ed.*2d 621, 629 (1981). In reviewing police action relative to a *Terry* stop, the court is required to first consider the officers' objective observations. "The evidence collected by the officer is 'seen and weighed not in terms of laboratory analysis by scholars, but as understood by those versed in the field of law enforcement.' (citation omitted) '[A] trained police officer draws inferences and makes deductions ... that might well elude an untrained person. The process does not deal with hard certainties, but with probabilities.' (citation omitted)" *State v. Davis, supra*, 104 *N.J.* at 501, 517 *A.*2d 859.

■ The second prong of the test requires the court to determine whether the evidence " 'raises a suspicion that the particular individual being stopped is engaged in wrongdoing.' " (citation omitted) *Ibid.* In *United States v. Cortez, supra*, the United States Supreme Court cautioned that investigatory seizures based upon suspicion short of probable cause must be temporary and last no

longer than is necessary to effectuate the purpose of the initial stop. The investigative methods employed should be the least intrusive means reasonably available to verify or dispel an officer's suspicion in a short period of time. The scope of the intrusion permitted obviously will vary depending upon the particular facts and circumstances of each case. *United States v. Cortez, supra,* 449 *U.S.* at 500, 101 *S.Ct.* 737.

Research has failed to identify any case in which the factual complex precisely parallels the circumstances of this case. The absence of legal precedent, however, is not surprising given the fact sensitive nature of the inquiry into investigatory or *Terry* stops. However, the State cites *State v. Anderson,* 198 *N.J.Super.* 340, 486 *A.*2d 1311 (App.Div.1985) in arguing the validity of the stop. In *Anderson,* a police officer on routine patrol received a report of an armed robbery having been committed by three black males at approximately 1:30 a.m. Responding to the report, the officer negotiated his police car onto the street where the robbery occurred. As he approached an intersection two blocks from the scene of the robbery, he observed another vehicle bearing an out-of-state registration occupied by two black males traveling in the opposite direction. Except for another police car, the vehicle occupied by the two black males was the only other car on the road. The police officer was unable to determine whether there was a third occupant in the vehicle due to tinted windows. Believing the occupants fit the description of the suspects, the officer proceeded to stop the vehicle. After the stop, a third occupant was discovered in the rear of the vehicle. The suspects were ordered out of the car, at which point the police discovered a weapon in plain view. The defendants were arrested and later identified as the assailants by the victims. *Id.* at 347–348, 486 *A.*2d 1311.

The Appellate Division concluded that the police lacked probable cause to arrest the defendants when their vehicle was first observed several blocks from the scene of the robbery. The court, however, upheld the stop. The court noted that it is the govern-

ment's interest in effective crime prevention and detection which underlies the recognition of a police officer's authority to approach a person for the purpose of investigating possible criminal behavior in the absence of probable cause. *Id.* at 351, 486 *A.*2d 1311. (citation omitted). In light of that compelling societal interest, the court found the stop supported by a reasonable, articulable suspicion. Unfortunately, omitted from the court's opinion in *Anderson* are important details as to the suspects' descriptions as provided to the police, other than their race. Thus, *Anderson* does not resolve the issue raised here.

Critical to the resolution of the existence of a reasonable and articulable suspicion is the proximity of the stop in time and place to the crime in question. In this regard, several out-of-state cases are informative. In *State v. Aillon,* 202 *Conn.* 385, 521 *A.*2d 555 (1987) the Connecticut Supreme Court found the following circumstances justified a *Terry* stop. At approximately 1:00 a.m., a Hamden, Connecticut police officer received a radio dispatch of a possible burglary at a business establishment in his patrol district. En route to the scene of the reported crime, the Hamden police officer noticed an automobile, subsequently determined to be Aillon's, traveling without illuminated headlights. He then observed the vehicle being stopped by a police car from North Haven, Connecticut. The Hamden police officer radioed his dispatcher, requested information on the vehicle and its driver and requested, if possible, that the driver be detained pending an investigation of the burglary. He then proceeded without stopping to the scene of the burglary. *Id.* at 562–563.

The North Haven police had stopped the defendant's vehicle because of a loud muffler and unilluminated rear license plate. The officer merely gave the defendant an oral warning and permitted him to proceed. *Id.* at 562.

Shortly thereafter, the North Haven police officer learned from a radio dispatch that the driver he had just released was a possible suspect in the burglary in Hamden. After broadcasting an alert for the vehicle, the defendant was ultimately stopped by

two other North Haven police officers. The officers again reviewed the defendant's credentials and conducted a visual examination of the interior of defendant's automobile. The visual examination revealed the existence of a knife. Defendant ultimately permitted the police to inspect the knife which appeared bloodstained. Defendant offered the police a benign explanation for the existence of the apparently bloody knife. His explanation was accepted by the police after obtaining permission to examine the trunk of defendant's automobile.

Finding no evidence of a burglary, the defendant was given a written warning for the equipment defects and permitted to leave. It was later determined that the defendant was a suspect in the murders of his estranged wife and two other individuals who had been killed earlier that day. Critical in the successful prosecution of defendant for those murders was the knife which was observed in defendant's car by the police after the second motor vehicle stop. *Id.* at 562–563.

The Connecticut Supreme Court found the second motor vehicle stop of the defendant was supported by a reasonable and articulable suspicion, notwithstanding the fact that he had been stopped and released earlier for identical motor vehicle infractions. *Id.* at 563. The court found that the second stop occurred only minutes after defendant's automobile had been seen in the vicinity of a recent burglary. That fact, together with the operation of defendant's vehicle without headlights, supported a second stop of his vehicle, notwithstanding the absence of evidence of criminal activity during the first stop. *Id.* at 563–564.

*In the Interest of D.M.*, 556 *Pa.* 160, 727 *A.2d* 556 (1999), the Pennsylvania Supreme Court found the following facts supported a reasonable and articulable suspicion justifying an investigative stop and frisk. At approximately 8:40 p.m., a Philadelphia police officer on routine patrol received a radio dispatch regarding "several" black males involved in a robbery at least eight or more blocks from his location. Approximately one or two minutes after receipt of the report and a short distance from the crime scene,

the officer observed four black males walking "very quickly." They were the only individuals in the vicinity. When the officer looked in their direction, they immediately changed their direction of travel. The officer then conducted a *Terry* stop which included a pat-down search of defendant D.M. The *Terry* frisk revealed the existence of a handgun. *In the Interest of D.M., supra,* 727 A.2d at 557.

Although the police had only a race and gender description, a majority of the Pennsylvania Supreme Court concluded that circumstance, together with the change in direction of defendant and his companions when observed by the police and their proximity in time and place to the scene of a violent crime, supported a reasonable and articulable suspicion justifying the *Terry* stop and frisk. *Id.* at 558.

In *State v. Saffeels,* 484 *N.W.*2d 429 (Minn.Ct.App.1992), the Minnesota Court of Appeals sustained a *Terry* stop under the following circumstances. At about 6:30 p.m., an armed robbery was reported at a motel at the intersection of a state highway and Interstate I–90, in Fairmont, Minnesota. The description of the assailant given by the victim was that of a white male with blond hair and a mustache, wearing a stocking-cap, dark ski jacket and blue jeans. The victim did not know whether the robber escaped on foot or in a vehicle. *Id.* at 429–430.

A police officer, approximately eight miles from the scene of the robbery, heard the report over his radio. He positioned his vehicle perpendicular to the traffic on I–90 and using his headlights, illuminated traffic on the westbound lanes of the freeway. The officer was parked in a clearly marked police unit. *Ibid.*

After observing eight to ten cars pass him, and all drivers evidencing some reaction to his presence, the officer observed a vehicle operated by the defendant. The driver was only identified as a male with blondish hair. The driver glanced away from the police car as he passed. The officer then began to follow the defendant. After tailgating the defendant for a distance, the officer was able to obtain a license plate check. The defendant

committed no motor vehicle violations while being observed by the police officer. For reasons of safety, the officer did not stop defendant's vehicle at that time. The vehicle was stopped later by other police officers after an alert had been broadcast. *Ibid.*

The Minnesota Court of Appeals was unimpressed by the lack of details in the assailant's description as reported by the victim. The court found that the particularly of the description is only one factor in the equation, which factor cannot be viewed in isolation. *Ibid.* The court reviewed the totality of circumstances and concluded that the fact that the freeway may have been the preferred route of escape for the robber and the lack of reaction by the defendant to the actions of the police officer while following him, together with the minimal description, justified the stop. *Id.* at 431.

In this case, the defendants argue that the only objective fact possibly linking them to the criminal activity was Norton's observation of Reiff wearing a white shirt. Defendants also argue that the significance of this fact is further diluted since Mrs. Turchick described her assailant as wearing a *white sweater* and *not a white shirt.* Defendants point out that when the police first observed defendants in the automobile, they did not discern their gender, actual height or any other clothing description or physical characteristics. Defendants also note that the police admit that defendants had committed no motor vehicle violations.

Concededly, the police had precious little information concerning the identity of the robber. They knew he was a tall male, wore dark pants and a white sweater. Because of the ski mask, the victim's ability to identify facial characteristics and other features was inhibited. The police also did not know whether the assailant had fled on foot or in an automobile. They did not know whether he acted alone or with one or more accomplices. Armed with this limited information, the police, when encountering the defendants within six minutes of the report of the crime and approximately three blocks from the scene, elected to conduct an investigatory stop of defendants' vehicle.

At first, defendants' arguments appear compelling. However, upon closer scrutiny, they are revealed to lack the additional virtue of completeness. Overlooked is the important nexus between the time and place and Norton's observation of the white-shirted passenger. In this case, the police were responding to the scene of a violent crime, an armed robbery within six minutes of the report of the crime. The police observed the defendants' vehicle approximately three blocks from the scene of the crime. It was the only vehicle they had encountered that evening, and it was traveling in a direction away from the scene of the crime.

The police had only a minimal physical description of the assailant. It is reasonable to assume that Mrs. Turchick's assailant would discard the ski mask after his flight from the scene of the crime. Because defendant Reiff was seated in an automobile, it is also reasonable to infer that the officer's observations of him would not reveal the color of his pants. However, Norton could see Reiff above the mid-chest area. While he could not state the height of this person, he certainly knew he was not diminutive in stature.

Clearly the strongest point of identification was the white shirt worn by Reiff. Although the report provided by the victim indicated her assailant was wearing a white sweater, it is reasonable to infer that the police recognized that a traumatized victim whose home had been invaded by a knife wielding robber might have mistaken a "white sweater" for a "white shirt." Consequently under the circumstances in this case, it was reasonable for the police to focus on the color of the top worn by defendant Reiff rather than the type of garment. *See State v. Arthur,* 149 *N.J.* 1, 10–11, 691 *A.*2d 808 (1997) (reviewing court "must give weight to the officer's knowledge and experience as well as rational inferences that could be drawn from the facts objectively and reasonably viewed in light of the officer's expertise.") Reflecting upon these observations from the vantage of a seasoned police officer with eighteen years experience, this court is satisfied that the police were objectively reasonable in focusing upon the occupants

of the only vehicle located in such close proximity to the scene of the crime.

■ The mere fact that Det. Sgt. Norton was unable to confirm all aspects of the victims' description does not in and of itself, vitiate an otherwise reasonable and articulable suspicion. *See State v. Mitchell,* 204 *Conn.* 187, 527 *A.*2d 1168, 1172 (1987), *cert. denied,* 484 *U.S.* 927, 108 *S.Ct.* 293, 98 *L.Ed.*2d 252 (1987) (existence of discrepancies between victims' description and defendants' actual appearance does not vitiate reasonable and articulable suspicion).

It is a significant factor that the information upon which the police acted, as sparse as it was, was obtained from an identified citizen who had only moments earlier been the victim of a violent crime. Consequently, the police were justified in relying on the reliability of that information in the furtherance of their investigation of the reported crime without the necessity of corroboration. *State v. Williams,* 251 *N.J.Super.* 617, 630–631, 598 *A.*2d 1258 (Law Div.1991). *See also In the Interest of D.M., supra,* 727 *A.*2d at 558.

■ Defendants would attempt to distinguish the circumstances in this case arguing that, except for the color of Reiff's shirt and defendants' proximity in time and place to the armed robbery, they engaged in no overt wrongdoing or suspicious behavior. However, as aptly observed by the Ninth Circuit,

Clearly the officers were not required to rule out all possibility of innocent behavior before initiating a brief stop and request for identification. The test is founded suspicion . . . Even if it was equally probable that the vehicle or its occupants were innocent of any wrongdoing, police officers must be permitted to act before their reasonable belief is verified by escape or fruition of the harm it was their duty to prevent. *U.S. v. Holland,* 510 *F.*2d 453, 454–455 (9th Cir.1975) *cert. denied* 422 *U.S.* 1010, 95 *S.Ct.* 2634, 45 *L.Ed.*2d 674 (1975).

In light of the totality of the circumstances present in this case, the stop of defendant Gavazzi's vehicle in which Reiff was a passenger, was reasonable and based upon a particularized suspicion. While the initial traffic stop certainly constituted a seizure, the balance between the competing interests of the gravity of the

public's concerns served by the seizure, the degree to which the seizure advanced the public interest and the severity of the interference with individual liberty, in this case, tilts in favor of finding the stop constitutionally permissive. *See State v. Seymour, supra,* 289 *N.J.Super.* at 84, 672 *A.*2d 1273 (citation omitted).

The initial stop of defendants' vehicle was minimally intrusive. It was supported by the legitimate investigative objective of determining whether defendant Reiff *further* matched the description provided by the victim of an armed robbery. The connection between the description provided by the victim and the police observations of defendant Reiff are not nearly as attenuated as urged by defendants when viewed objectively in light of all attendant circumstances including the location and time of the observation, and the absence of other vehicular traffic. *See State v. Dickey,* 152 *N.J.* 468, 477, 706 *A.*2d 180 (1998).

Accordingly, this court is satisfied that the police had a reasonable and particularized objective suspicion justifying an investigatory stop of defendants' vehicle. The black handbag which was observed in plain view matched the description of the bag taken from the victim. The police were justified in removing that bag after its plain view discovery and the denial of a possessory interest by the defendants. *See State v. Ellis,* 246 *N.J.Super.* 72, 76–77, 586 *A.*2d 876 (Law Div.1990). The order to the defendants to exit their vehicle after the stop, was justified and constitutionally permissible. *See State v. Smith,* 134 *N.J.* 599, 609, 637 *A.*2d 158 (1994) (holding that an officer may order both the driver and passenger to exit their vehicle after a lawful motor vehicle stop). The court is further satisfied that since the initial stop and discovery of Mrs. Turchick's handbag were constitutionally permissible, the subsequent warrant search of the vehicle and the statements obtained from the defendants are not tainted by the "fruit of the poisonous tree" doctrine. *See Wong Sun v. United States,* 371 *U.S.* 471, 83 *S.Ct.* 407, 9 *L.Ed.*2d 441 (1963). Accordingly, defendants' motion to suppress evidence seized from

the defendants as a consequence of their arrest on April 22, 1999 is denied.