**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5223-14T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

RONALD T. DANIELS, JR.,

     Defendant-Appellant.

_____

Submitted May 14, 2018 – Decided March 4, 2019

Before Judges Ostrer and Whipple.

On appeal from Superior Court of New Jersey, Law Division, Monmouth County, Indictment Nos. 14-01-0037.

Joseph E. Krakora, Public Defender, attorney for appellant (Daniel S. Rockoff, Assistant Deputy Public Defender, of counsel and on the brief).

Christopher J. Gramiccioni, Monmouth County Prosecutor, attorney for respondent (Monica do Outeiro, Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

OSTRER, J.A.D.

The trial court denied the motion of defendant Ronald T. Daniels, Jr., to suppress a handgun that police seized from his person after a pat-down search. Thereafter, a jury found defendant guilty of second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b), and fourth-degree possession of hollow nose bullets, N.J.S.A. 2C:39-3(f), but acquitted him of first-degree murder, N.J.S.A. 2C:11-3(a)(1), (2), and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a). The court imposed an eight-year term of imprisonment with four years of parole ineligibility.

In appealing his conviction, defendant challenges the court's suppression denial, by arguing:

POINT I

BECAUSE POLICE LACKED THE INDIVIDUALIZED REASONABLE AND ARTICULABLE SUSPICION OF CRIMINAL ACTIVITY NECESSARY TO SEIZE AND SEARCH TEN PEOPLE, INCLUDING MR. DANIELS, WITHOUT A WARRANT, THE COURT ERRED BY DENYING THE MOTION TO SUPPRESS. U.S. Const., Amends. IV, XIV; N.J. Const., Art. I, ¶ 7.

A. The State Did Not Prove that the Officers' Warrantless Seizure of Ten People, Including Mr. Daniels, Was Lawful.

A-5223-14T4

B.   The State Did Not Prove that the Officers' Warrantless Search of Ten People, Including Mr. Daniels, Was Lawful.

Defendant also challenges the court's sentence, contending:

POINT II

A RESENTENCING REMAND IS REQUIRED BECAUSE THE COURT OFFERED NO REASONS FOR IMPOSING A PAROLE DISQUALIFIER GREATER THAN THE STATUTORY MINIMUM, AND ALSO INAPPROPRIATELY ACTED AS A THIRTEENTH JUROR BY DECIDING MR. DANIELS HAD BEEN AN "ACCESSORY" TO CONDUCT FOR WHICH HE WAS ACTUALLY ACQUITTED.

Having reviewed these arguments in light of the record and applicable principles of law, we affirm defendant's conviction but remand for resentencing.

I.

Applying our deferential standard of review, we uphold the trial court's factual findings after the suppression hearing, as they were supported by sufficient credible evidence.  See State v. Elders, 192 N.J. 224, 243-44 (2007). The trial judge credited the testimony of the two witnesses at the suppression hearing: Asbury Park police officer Lorenzo Pettway and Neptune Township police officer Nicholas Taylor.

A-5223-14T4

Pettway testified that a confidential informant (CI) called him to report observing a man with a gun. The CI said the man was black, had dreadlocks, and wore a white t-shirt. He was on the east side of the apartment complex at 1514 Monroe Avenue, near the border between Neptune Township and Asbury Park, with a group of other people. Pettway considered the CI reliable, as the CI had provided helpful and accurate information for three or four years. Also, the CI was not facing charges that would suggest self-interest.

As the address was on the Neptune Township side of the border, Pettway conveyed this information to Taylor, with whom he had worked in the past on joint investigations. Taylor described the area as a high-crime area where the Bloods street gang was active. Taylor assembled four Neptune Township officers to plan their response to the scene, but one was dispatched to a shooting a mile away. So, Taylor and the three remaining officers approached the address on foot at around 10:25 p.m., roughly an hour after the CI called Pettway. Taylor and one fellow officer approached the east side of the apartment complex, while the other two entered the complex from the south and north, to prevent flight.

As Taylor came upon a group of ten men and a woman, he heard one say, "Oh shit, it's the cops." Taylor recognized four men from prior dealings as members of the Bloods. Included was Shamere Reid, who started to walk away.

4

Reid wore a white collared shirt, had dreadlocks, and was black. Taylor observed him reach into his pants, toss a handgun over a fence, and then heard it clank on the pavement.

At that point, Taylor placed Reid under arrest and handcuffed him. Taylor said Reid was agitated and hostile. The officer accompanying Taylor commanded the rest of the group to sit. Once the other two officers arrived, Taylor ran around the fence to retrieve Reid's gun. Upon return, Taylor noticed defendant, with whom he was unfamiliar, in the front of the seated group. Defendant also had dreadlocks, was black, and wore a white tank top. Taylor said defendant appeared nervous and uncomfortable. While seated, he moved side to side while he scanned the area, suggesting to Taylor that he was looking for an avenue of escape.

Suspecting defendant possessed a firearm, Taylor asked him to stand up. Taylor patted down his waistband and felt something hard. Grasping it, he recognized the butt of a handgun, which he then seized. A further search of defendant and of the other members of the group did not uncover additional contraband.

The judge held that, under the totality of the circumstances, Taylor had a reasonable and articulable suspicion to stop defendant and pat him down for

weapons. The judge noted that it was late at night in a high-crime area; gang members were present; a shooting had recently occurred nearby; the officers were significantly outnumbered; and the CI was known to be reliable. Corroborating the CI's information, police discovered a gun possessed by a man (Reid), who roughly matched the CI's description, in the place and among a group the CI described. However, defendant also matched the CI's description, and he appeared nervous and of a mind to flee. Citing Terry v. Ohio, 392 U.S. 1 (1968) and State v. Roach, 172 N.J. 19 (2002), among other authorities, the judge held that Taylor had a reasonable and articulable suspicion that defendant was armed and dangerous, and was therefore justified in conducting a protective pat-down. Upon doing so, Taylor had probable cause to search and seize the handgun.

Applying a de novo standard of review, see State v. Jessup, 441 N.J. Super. 386, 389-90 (App. Div. 2015), we discern no error in the trial court's application of its factual findings to the governing principles of law. Two intrusions occurred here: the order to defendant to stop, and the pat-down of his waist. We must analyze the events separately. "[W]hether there is good cause for an officer to make a protective search incident to an investigatory stop is a question separate from whether it was permissible to stop the suspect in the first

6

place." State v. Thomas, 110 N.J. 673, 678-79 (1988); accord State v. Lund, 119 N.J. 35, 45 (1990).

First, we conclude the police had sufficient grounds, after arresting Reid for gun possession, to direct the rest of the group to stop and sit so the police could investigate further. Police are entitled, without a warrant, to conduct a brief investigatory stop if they find "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21. Something more than a "hunch," but less than probable cause, is required. State v. Barrow, 408 N.J. Super. 509, 517 (App. Div. 2009) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)). "There must be 'some objective manifestation that the suspect was or is involved in criminal activity.'" State v. Arthur, 149 N.J. 1, 8 (1997) (quoting Thomas, 110 N.J. at 678). The court considers the reasonableness of a stop based on the totality of the circumstances. State v. Stovall, 170 N.J. 346, 361 (2002).

The trial judge cogently recounted the circumstances that warranted stopping the group of men and woman to investigate. The police already found that one person in the group – Reid – possessed a gun and attempted to discard it. That corroborated the CI's information, and justified further investigation. See State v. Birkenmeier, 185 N.J. 552, 562 (2006) (stating that a "confidential

informant's tip, once corroborated by the observations made by the police, provided sufficient reasonable suspicion to detain and conduct an investigatory stop of [the] defendant"); State v. Esteves, 93 N.J. 498, 506 (1983) (noting that discovery of one weapon in vehicle would have created probable cause to search swiftly for other, concealed weapons).

Three men, in addition to Reid, were known gang members. See State v. Privott, 203 N.J. 16, 29 (2010) (finding defendant's association with gang members supported reasonable suspicion of carrying concealed weapon). It was late at night in a high-crime area. See State v. Pineiro, 181 N.J. 13, 26 (2004) (considering presence in high-crime area as factor contributing to reasonable suspicion). Without focusing yet on defendant, the police had sufficient grounds to prevent the entire group from leaving, to investigate whether anyone else in the group with Reid possessed a weapon or was engaged in criminal activity.

Defendant contends that once Reid was arrested, the CI's tip was "exhausted," leaving no basis to investigate further. To the contrary, corroboration of the CI's information, including that a man among a group of people possessed a gun, warranted further investigation of the group. As Taylor

explained, based on his experience, the other group members may also have possessed guns.[1]

Second, Taylor had sufficient grounds to frisk defendant based on defendant's conduct, demeanor, and appearance, which matched the CI's description.[2] During an investigatory stop, a police officer may conduct a protective search, that is, a pat-down or frisk, "where [the officer] has reason to believe that he [or she] is dealing with an armed and dangerous individual." Terry, 392 U.S. at 27. The test is objective; we consider whether "a reasonably prudent man [or woman] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger." Ibid. The officer need not be "absolutely certain" a suspect is armed before conducting a brief

---

[1] Defendant also contends the court misplaced reliance on the shooting that occurred shortly before the stop, because Taylor testified that he had no objective basis at the time to link that event with his investigation at the Monroe Avenue apartments. However, police later determined that the gun seized from defendant was used in the shooting. In any event, the trial court had ample basis to find reasonable suspicion without relying on the shooting incident.

[2] Although defendant contends that the police had no basis to "search . . . ten people, including [defendant]," defendant has standing only to challenge the search of his own person. See State v. Alston, 88 N.J. 211, 220 (1981) (stating that generally, "a motion to suppress evidence obtained in violation of the Fourth Amendment may be successfully brought only by those persons whose rights were violated by the search itself"). Besides, the contraband relevant to his conviction was found only in his possession.

protective search. Ibid. As with a stop, in considering the reasonableness of a protective search, "due weight must be given . . . to the specific reasonable inferences which [the officer] is entitled to draw from the facts in light of his [or her] experience." Ibid. "[I]t is important for courts to take a realistic approach to 'reviewing police behavior in the context of the ever-increasing violence in society.'" State v. Bard, 445 N.J. Super. 145, 157 (App. Div. 2016) (quoting State v. Valentine, 134 N.J. 536, 545 (1994)).

In addition to the circumstances that justified stopping defendant and the rest of the group, defendant's own behavior aroused safety concerns. First and foremost, defendant matched the CI's description of the gun possessor. While, technically, defendant wore a tank top instead of a t-shirt, his clothing fit the description as well as Reid's collared shirt did. Thus, Taylor could not know whether the CI observed Reid or defendant. See State v. Gavazzi, 332 N.J. Super. 348, 361 (App. Div. 2000) (stating that police were justified in stopping man in white shirt when victim identified assailant as wearing a white sweater).

Defendant also appeared nervous. See Elders, 192 N.J. at 250 (stating that nervousness may contribute to finding reasonable suspicion). He also was scanning the scene, apparently looking for a way to flee. Cf. Piniero, 181 N.J.

at 26 (stating that flight "in combination with other circumstances . . . may support reasonable and articulable suspicion").

Under the totality of these circumstances, Taylor had sufficient grounds to conduct a pat-down of defendant's waist.  Upon discovery of what appeared to be the butt of a gun, he had probable cause to seize it.

In sum, the trial court did not err in denying defendant's motion to suppress.

## II.

Defendant contends the trial court did not adequately state its reasons for imposing a four-year period of parole ineligibility.  We are constrained to agree. We may not second-guess a court's exercise of sentencing discretion that conforms with the Code's sentencing guidelines.  State v. Roth, 95 N.J. 334, 365 (1984).  Under the sentencing law in effect when defendant committed his offense, the court was required to impose a period of parole ineligibility between one third and one half the eight-year base term, or three years if greater.  See N.J.S.A. 2C:43-6(c) (2012).  Therefore, the court had the discretion to impose a parole-ineligibility period between three and four years.

However, regardless of the statutory source of a minimum term, the court must set forth the reasons for its decision, based on the aggravating and

11

mitigating factors and in light of the base term imposed. See State v. Jefimowicz, 119 N.J. 152, 163 (1990) (stating "sentencing courts must be cognizant of their flexibility in determining the duration of parole ineligibility even under the Graves Act" and must "weigh aggravating and mitigating factors . . . to fix the period of parole ineligibility"); see also State v. Kirk, 145 N.J. 159, 179 (1996) (stating that a sentencing court must "state on the record the reasons supporting . . . any term of parole ineligibility not mandated by statute"). We therefore remand for reconsideration of the parole ineligibility term.

Defendant also contends the court, in fashioning defendant's sentence, inappropriately considered defendant an accessory to the murder of which he was acquitted. Defendant mischaracterizes the judge's statement. Before proceeding to address aggravating factor five, "substantial likelihood that the defendant is involved in organized criminal activity," N.J.S.A. 2C:44-1(a)(5), the judge stated the jury's verdict was understandable because the State's two key witnesses "were less than stellar" and one conceded his willingness to lie. Nonetheless, the judge found that defendant was involved with the Bloods and ultimately came to possess the gun that was used in a gang-related homicide:

> But these facts do seem to remain. This defendant, a member of the Bloods street gang, was at a gathering of other Bloods members. At some point a decision was made for he and at least two other people

12

to go to a location where the rival street gang of Crips hung out. There's no other explanation for why they would go there.

Upon arrival, shots were fired. An individual was killed. I don't think there's any question that this defendant was present at the time . . . within 15 minutes . . . after shots being fired this defendant was found with a handgun that was ballistically matched up to be the handgun that the bullets came out of that killed the individual. And when originally confronted by the police, he didn't voluntarily turn over the gun. The gun was observed and taken from him within 15 minutes.

So I don't think there's any question that his involvement here was at least as an accessory at some point. And that there's a substantial likelihood that he was involved at the time that this incident occurred in organized criminal activity as a Bloods member. So I find aggravating five exists.

Although perhaps inartful in his choice of words, the judge did not find that defendant committed a substantive offense as an "accessory" to the murder, but that his secreting the murder weapon fifteen minutes after the homicide demonstrated his involvement in organized criminal activity. Thus, the judge's finding of aggravating factor five was consistent with the jury's verdict.

Affirmed as to the conviction and the base term of the sentence. Remanded for reconsideration of the period of parole ineligibility.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION