EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| EL Pueblo de Puerto Rico<br><br>    Peticionario<br><br>        v.<br><br>Mairo Pérez Rivera<br><br>    Recurrido | Certiorari<br><br>2012 TSPR 146<br><br>186 DPR ____ |

Número del Caso: CC-2011-131

Fecha: 26 de septiembre de 2012

Tribunal de Apelaciones:

        Región Judicial de Arecibo

Oficina del Procurador General:

        Lcda. Zaira Girón Anadón
        Subprocurador General

        Lcda. Ana R. Garcés Camacho
        Procuradora General Auxiliar

Abogado de la Parte Recurrida:

        Lcda. Isabelle C. Oria Calaf
        Sociedad para Asistencia Legal de P.R.

Materia:   Procedimiento Criminal – Motivos fundados para realizar arresto sin orden judicial

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Peticionario

v.

Mairo Pérez Rivera

    Recurrido

Certiorari

CC-2011-0131

Opinión del Tribunal emitida por el Juez Asociado señor Rivera García

En San Juan, Puerto Rico, a 26 de septiembre de 2012.

El Ministerio Público nos solicita que revoquemos el dictamen del Tribunal de Apelaciones que confirmó la supresión de cierta evidencia en un caso en que el acusado confesó ser autor de un asesinato. Ello así, pues el foro apelativo sostuvo que las declaraciones del acusado que condujeron a los agentes del orden público a localizar el arma homicida fueron producto de un arresto ilegal. En ese contexto, el recurso de autos permite expresarnos sobre la doctrina de los motivos fundados y reiterar las instancias en las que un agente del orden público está autorizado a realizar un arresto sin una orden judicial.

La adecuada atención de la controversia que nos ocupa, exige que presentemos los antecedentes fácticos y las incidencias procesales de mayor relevancia.

I

El 31 de diciembre de 2009 se halló el cuerpo sin vida del Sr. Ramón Vázquez Sánchez (señor Vázquez Sánchez) en su residencia en el barrio Barahona de Morovis. Según el análisis de la escena, el occiso mostraba heridas de defensa en las manos, heridas abiertas en el área abdominal, en el costado y en otras partes de su cuerpo. Ese mismo día, el Sr. Mairo Pérez Rivera (señor Pérez Rivera o el recurrido) fue arrestado y posteriormente, el 15 de abril de 2010, fue acusado por el delito de asesinato en primer grado[1] y por la portación y uso de un arma blanca, en específico, un cuchillo.[2]

Luego de varias incidencias procesales, el 22 de julio de 2010 la defensa presentó una moción de supresión de evidencia. En particular, solicitó la supresión de la confesión que realizó el recurrido en cuanto a los hechos que culminaron en la muerte del señor Vazquez Sánchez, pues adujo que esta fue producto de un arresto ilegal. Por iguales fundamentos, peticionó la supresión de los resultados de la toma de huellas dactilares y de la evidencia física que se obtuvo, analizada por el Instituto de Ciencias Forenses. Así también, solicitó que se suprimiera el cuchillo que se utilizó como arma homicida,

---

[1] Art. 106 del Código Penal, 33 L.P.R.A. sec. 4734.
[2] Véase Anejo V del Apéndice del recurso de *certiorari*, pág. 48.

el cual fue recuperado por la Policía de Puerto Rico con la cooperación del acusado.

Oportunamente, la Fiscalía se opuso a la solicitud de supresión de evidencia y sostuvo que la Policía tenía motivos fundados para arrestar al recurrido, conforme a la Regla 11 de Procedimiento Criminal, 34 L.P.R.A. Ap. II.[3] En síntesis, el Estado expuso que los motivos fundados consistían en que los agentes tenían información en ese momento de que el señor Pérez Rivera: era un vecino cercano del occiso y que había tenido problemas únicamente con él; que la noche de los hechos dos vecinos lo observaron en los predios de la casa de la víctima; y que fue la única persona vista merodeando la escena del crimen.[4]

Así las cosas, el 4 de agosto de 2010 el foro de primera instancia celebró la vista de supresión de evidencia. En esta, la Fiscalía presentó como prueba testifical al Sgto. Francisco Pérez Rivera (sargento Pérez) y al Agte. Juan Grau Otero (agente Grau). Por estipulación de las partes, se sometió como prueba documental lo siguiente: fotografías, condiciones de ingreso, consentimiento para la toma de huellas dactilares y los documentos que evidenciaban que se le realizaron las advertencias de ley. Además, el Estado presentó la

---

[3] Véase Moción en oposición a solicitud de supresión de evidencia y otros extremos, Apéndice del recurso de *certiorari*, pág. 61.
[4] Íd.

declaración jurada suscrita por el señor Pérez Rivera el 4 de enero de 2010.[5]

De conformidad con la transcripción de la prueba oral, las declaraciones de los testigos pueden resumirse como reseñamos a continuación.

**Testimonio del Agte. Juan E. Grau Otero**

El agente Grau declaró que el 31 de diciembre de 2009 se dirigió al barrio Barahona de Morovis luego que el retén de turno le informará que había una persona muerta en una residencia. Una vez llegó al lugar, entró a la casa y notó que había sangre en el suelo y vio el cuerpo de la víctima arrodillado frente al sofá. En esa posición, se percató de que la mano derecha del cuerpo tenía heridas "como de defensa".[6] Al observar esto, solicitó entonces a la familia -incluidos el hermano y el cuñado de la víctima- y a los vecinos, que salieran de allí. Continúo relatando que subsiguientemente llamó a su supervisor y le indicó que según lo apreciado por él, la escena revelaba una muerte violenta. De esa forma, procedió entonces a entrevistar al hermano de la víctima y le preguntó si el occiso había tenido problemas con alguien. Indicó el agente que este le expresó que sí, que sentía temor y que sospechaba que el recurrido pudo haberle hecho algo o estaba involucrado en el asesinato.[7] Ante ello, el agente

---

[5] La declaración jurada fue admitida como *exhibit* el día de la vista de supresión de evidencia. Véase Transcripción estipulada de la prueba, Apéndice del recurso de *certiorari*, págs. 167-168.

[6] Transcripción estipulada de la prueba, Apéndice del recurso de *certiorari*, pág. 152.

[7] Íd., pág. 155.

Grau le preguntó por qué pensaba eso y él le dijo que ellos (el occiso y el recurrido) habían tenido un problema, puesto que alegadamente el recurrido le había robado al señor Vázquez Sánchez un dinero.

Acto seguido, el funcionario entrevistó al señor Pérez Rivera, que según la información que tenía hasta ese momento, fue la persona que encontró al occiso.[8] El agente Grau atestó que el recurrido le relató que mientras subía por el lateral de la casa del occiso vio unas gotas de sangre en el piso y en la puerta y que por ello pensó que habían matado a alguien, o que había parido una gata. El agente relató que en ese momento percibió que había algo raro en lo que le decía, pues las manchas de sangre de la puerta no se podían ver desde el lado en que el recurrido dijo que las vio. El agente continuó declarando que cuando le inquirió al señor Pérez Rivera a esos efectos, este no le supo contestar, por lo que le solicitó que se quedara en el lugar para que los agentes de homicidios lo entrevistaran.

Dijo el testigo que luego pasó a entrevistar al cuñado del occiso. Este último le manifestó que fue el señor Pérez Rivera quien llegó a su casa para decirle que habían matado al señor Vázquez Sánchez.[9] El agente Grau testificó, además, que una vez llegaron los familiares del occiso, estos hicieron comentarios que le llevaron a preocuparse por la seguridad del recurrido y del hermano

---

[8] Íd., pág. 156.
[9] Íd.

del occiso. Por tal razón, a eso de las 9:00 a.m. decidió enviarlos a un cuartel de la policía en el barrio Barahona para su protección. Relató el agente que el recurrido fue ubicado en un cuarto de entrevistas y que el hermano del occiso permaneció con el retén. Una vez llegó el agente de homicidios, procedió a informarle a este los datos que tenía del incidente, terminando así su intervención en el caso.

**Testimonio del Sgto. Francisco Pérez Rivera**

Por su parte, el sargento Pérez declaró que cuando encontraron el cuerpo del señor Vázquez Sánchez se personó a la escena del crimen entre 9:30 a 10:00 a.m. y procedió a entrevistar al agente Grau para obtener datos relevantes del caso. Este último le indicó que había una persona apuñalada y muerta en la sala de su residencia (la del occiso). Asimismo, el sargento testimonió que el agente le informó que el recurrido estaba detenido en el cuartel de Morovis y que el hermano del occiso le había indicado que esta persona había tenido problemas con la víctima y que acostumbraba a ir a su casa a robarle.[10] Igualmente, declaró el sargento que el agente Grau le manifestó que el hermano de la víctima también estaba en ese cuartel. Añadió que entonces procedió a entrevistar al cuñado y al hermano del occiso, quienes le dijeron que el señor Pérez

---

[10] Íd., pág. 164.

Rivera había tenido problemas con él y que siempre se pasaba en el lugar.[11]

El testigo continuó relatando que luego se trasladó a la División de Homicidios en la Comandancia de Arecibo entre 5:00 y 6:00 p.m. y que entrevistó al recurrido después de hacerle las advertencias legales, cosa que hizo en presencia del Sgto. Robert Mercado.

A continuación, resumimos el testimonio del sargento Pérez respecto a la descripción que le ofreció el recurrido en cuanto a lo que vio el día de los hechos.

El recurrido le narró al sargento que el 30 de diciembre de 2009 iba camino al trabajo a las 7:00 a.m. acompañado por su esposa y su hermana. El recurrido le dijo que mientras subían, miraron hacia la residencia del señor Vázquez Sánchez y se percató de que había unas manchas de sangre en una toalla. Agregó que en ese momento se cruzó en el camino con el hermano del occiso y le comentó sobre lo que vio. El hermano le dijo que iría entonces a la residencia de su cuñado a buscar las llaves de la casa de la víctima para constatar qué había ocurrido. Acorde al sargento Pérez, el acusado relató que siguió su camino al trabajo quedándose algunos 25 minutos allí. Añadió que luego regresó y vio las patrullas que circundaban el área, cuando entonces, el agente Grau lo detuvo para hacerle unas preguntas. Continuó relatando el recurrido que un tercero de nombre "Chapo" mató a la

---

[11] Íd., pág. 167.

víctima y que este último lo amenazó con matarlo si lo delataba. Agregó el sargento que el acusado le indicó, además, que el arma que se utilizó en el asesinato estaba detrás de una casa cerca de unas matas de plátano y que estaba dispuesto a llevarlo al lugar para buscarla.

Testificó el sargento que esa misma noche la policía entrevistó al "Chapo" y a la esposa de este. Sin embargo, entendieron que hasta ese momento el "Chapo" no guardaba relación con los hechos.[12] También declaró el sargento que durante esa noche se personaron al lugar donde ubicaba el cuchillo, pero que por las inclemencias del tiempo decidieron volver al día siguiente (1 de enero de 2010) con el recurrido. Expresó, además, que debido a que el acusado figuraba como sospechoso y por instrucciones de la Fiscalía, lo mantuvieron en la celda. Señaló que al otro día volvieron a buscar el cuchillo con el recurrido y que lo encontraron.[13] Posteriormente, regresaron a la Comandancia de Arecibo y, horas más tarde, los agentes liberaron al señor Pérez Rivera.[14]

Continuó relatando el testigo que regresó a la comunidad el 4 de enero de 2010 para entrevistar al Sr. Rubén González, quien le informó que el 30 de diciembre de 2009, a eso de las 10:00 p.m., vio al recurrido brincar la verja de la residencia del occiso hacia la carretera.

---

[12] Transcripción de la prueba estipulada, Apéndice del recurso de *certiorari*, pág. 175.
[13] Íd., pág. 170.
[14] Íd. pág. 172. Se desprende de la transcripción de la prueba que el recurrido quedó citado para la toma de huellas dactilares.

Señaló, además, que ese mismo día solicitó al recurrido que lo acompañara para tomarle huellas dactilares en el cuartel de Morovis y que este accedió a ir de forma voluntaria. Indicó el sargento que ese día llegaron a la estación alrededor de las 3:40 p.m. y que nuevamente le leyó las advertencias al recurrido para proceder a tomarle las huellas, y este accedió y fue bien cooperador.[15] Manifestó, también, que en ese momento estuvieron presentes la Agte. Rita Rosado, quien figuró como testigo durante la realización de las advertencias, y el Sgto. Roberto Mercado, quien realizó la toma de huellas. Luego de finalizar ese procedimiento -según se desprende del testimonio del sargento Pérez- ocurrió el incidente siguiente:

> Posteriormente a que se tomaron las huellas él me indica que él quiere hablar con nosotros, que él quiere hablar conmigo y que quiere levantar sus manos por que él tiene algo que no puede seguir con eso. Ahí en esos momentos pasa el agente Montalvo y este servidor donde él pero a todo esto él no quiere que yo esté ahí que yo soy el investigador, yo salgo fuera y habla con el agente Montalvo, él me indica que pase donde él porque él quiere hablar conmigo. **Ahí él me indicó me dijo mire yo a usted le fallé yo me quiero sacar esto que tengo por dentro por que esa muerte como tal yo estaba ahí, yo fui el que utilicé el cuchillo para esa fecha**… . (Énfasis nuestro.)
> Transcripción estipulada de la prueba, Apéndice del recurso de *certiorari,* pág. 172.

El sargento Pérez aseveró que cuando el recurrido comenzó a hacer las anteriores admisiones, se le hicieron nuevamente las advertencias. Asimismo, expresó que, una

---

[15] Íd.

vez recibida la información, acudieron a la Comandancia donde se le tomó una declaración jurada al señor Pérez Rivera.

Resumido el testimonio que el sargento Pérez ofreció durante la vista, pasemos entonces a esbozar los detalles de la declaración jurada que suscribió el recurrido el 4 de enero de 2010.

En la referida declaración, el señor Pérez Rivera narró los hechos que le provocaron la muerte al señor Vázquez Sánchez.[16] Declaró que mientras ayudaba a la víctima a limpiar la casa, este último le ofreció $20 para que tuviera relaciones sexuales con él y que acto seguido lo pegó a la cama y abusó de él durante media hora. Cuando terminó, según narra el recurrido en la declaración, la víctima no le pagó los $20. En consecuencia, atestó que:

> Esa noche yo apagué los "breakers", a las 10 de la noche de la casa de Monchito que están en la parte de atrás de la casa. Después yo toqué la puerta de la casa de Moncho. Moncho abrió la puerta un chispito y Chapo la forzó y la abrió. Yo le di una puñalada de punta con un cuchillo en la mano. Chapo siguió apuñalándolo por todos lados, en la barriga y por todos lados lo apuñaleó. Yo di la primera puñalá. Chapo le pedía chavos y yo también, pero Moncho decía que no tenía nada. Chapo lo apuñaló muchas veces, Moncho trató de defenderse poniendo las manos al frente y luego cayó al piso del cuarto y gritaba.
>
> Declaración Jurada, Apéndice del recurso de *certiorari*, pág. 68.

---

[16] Apéndice del recurso de *certiorari*, pág. 67.

En dicho documento el recurrido alegó, además, ser paciente de APS[17] y que no se tomaba los medicamentos, pero que estaba tranquilo. Con relación al cuchillo, dijo que lo tiró para la maleza detrás de la casa de la víctima y que cayó cerca de una mata de plátano. Igualmente, en relación con lo acaecido el 31 de diciembre de 2009, antes de llegar a su trabajo, le dijo al hermano de la víctima que vio una toalla con manchas de sangre en su residencia. Narró que no pudo trabajar ese día por falta de materiales y que llevó a su padre a su casa. También, expresó que mientras iba de camino a su hogar, el agente Grau lo llamó y le requirió su información personal, y que luego se trasladó al cuartel de Morovis para ser entrevistado en relación con la muerte del señor Vázquez Sánchez. Dijo, además, que luego lo esposaron, le hicieron las advertencias, lo ingresaron a una celda y lo llevaron a Arecibo.

El acusado narró en la declaración jurada la versión que le ofreció el 31 de diciembre de 2009 al sargento Pérez, en la que expresó que el "Chapo" era el asesino; dijo conocer donde estaba el arma del delito y manifestó su disponibilidad de llevar a las autoridades a encontrarla. Sin embargo, en esa declaración jurada del 4 de enero reiteró que la información provista en ella era verdad y que se le leyeron las advertencias. Consiguientemente, el 5 de enero de 2010 la Fiscalía

---

[17] American Psychological Services Health Care (APS) es una compañía de manejo coordinado de salud mental del Plan de Salud de Puerto Rico.

procedió a autorizar la presentación de las denuncias por los delitos imputados.[18]

Luego de evaluada la prueba testifical y documental, el foro primario declaró "con lugar" la solicitud de supresión de evidencia mediante Minuta de 4 de agosto de 2010. Consecuentemente, se suprimieron varias manifestaciones del recurrido, los resultados de las huellas dactilares y otra prueba física, incluida el arma homicida.[19] En consecuencia, dicha evidencia no podría ser presentada como prueba de cargo durante el juicio en su fondo. Insatisfecho, el 6 de agosto de 2010 el Ministerio Público presentó una moción de reconsideración, la cual fue denegada mediante Resolución de 24 de agosto de 2010.

Inconforme con tal proceder, el Estado recurrió al foro apelativo intermedio. Así pues, el 21 de diciembre de 2010 el tribunal *a quo* modificó la decisión recurrida dictaminando que procedía admitir como evidencia las manifestaciones que el señor Pérez Rivera le ofreció al agente Grau el 31 de diciembre de 2009. De otra parte, confirmó al foro primario en cuanto a que el arresto del recurrido fue ilegal, debido a la ausencia de motivos fundados para realizarlo. Ante la determinación de la

___

[18] Íd., pág. 70.

[19] La minuta -que tampoco está firmada por el juez que presidió la vista- no hace alusión concretamente a qué evidencia se suprime. Basándonos en la solicitud de supresión, se colige que se suprimieron las manifestaciones, huellas y resultados aludidos. Debemos destacar que según la pauta de Pueblo v Moreno Valentín, 168 D.P.R. 233 (2006), le corresponde al Tribunal de Apelaciones determinar si la minuta que recoge la decisión judicial del foro primario es suficiente para permitirle cumplir su función revisora. En el caso de autos, el foro a quo no ordenó al tribunal de instancia a que fundamentara su decisión de suprimir la evidencia, pero sí contó con la transcripción estipulada de la vista de supresión de evidencia.

ilegalidad del arresto, coligió entonces que procedía suprimir las manifestaciones que el recurrido le ofreció al sargento Pérez ese mismo día, así como el cuchillo que se ocupó. Empero, el Tribunal de Apelaciones determinó que no procedía la supresión de las huellas dactilares del acusado obtenidas el 4 de enero de 2010, como tampoco de la confesión que este prestó en esa misma fecha.

Así las cosas, el 22 de febrero de 2011 el Ministerio Público presentó ante nos una Moción en Auxilio de Jurisdicción y un auto de *certiorari.* En su recurso nos solicita que revoquemos el dictamen del Tribunal de Apelaciones y nos señala la comisión del error siguiente:

> Cometió error de derecho el Honorable Tribunal de Apelaciones al determinar que la intervención de los agente[s] con el acusado el día 31 de diciembre de 2009 fue un arresto ilegal al ser efectuado con orden, toda vez que existían motivos fundados para creer que el acusado había cometido el delito grave de asesinato en presencia de las siguientes circunstancias fácticas: a) el cadáver mostraba heridas cortantes en las manos, por lo que en ese momento se investigaba un asesinato (delito grave); b) existía un testimonio que ubica al acusado como la primera persona en llegar a la escena del crimen; c) el agente investigador, Agte. Juan Grau Otero, tenía propio y personal conocimiento de que el acusado estaba mintiendo sobre algo relacionado a la escena del crimen y había observado una conducta claramente dudosa por el acusado al ser confrontado con la evidente falsedad de su versión; d) al tomar los datos del hermano del occiso, éste informó que la única persona con quien la víctima tenía problemas era con el acusado, pues ya en una ocasión había sido víctima de su conducta delictiva; y e) también se había informado al agente que el occiso tenía miedo por esos incidentes previos. Véase, recurso de *certiorari,* pág. 22.

El 16 de marzo de 2011 expedimos el recurso de epígrafe y ordenamos la paralización de los procedimientos ante el foro primario. Contando con los alegatos de ambas partes, procedemos a resolver.

II

A. *El arresto y sus exigencias constitucionales*

La Constitución de Puerto Rico establece que ninguna persona podrá ser privada de su libertad o propiedad sin un debido proceso de ley. Const. E.L.A., L.P.R.A. Tomo I, ed. 2008, pág. 296. Esta disposición es la "matriz de la garantía de los derechos individuales ante la intervención injustificada del Estado con el ciudadano". Pueblo v. Román Mártir, 169 D.P.R. 809, 821-22 (2007). Es decir, el derecho constitucional a un debido proceso de ley es la "garantía fundamental de protección que tiene un ciudadano contra los posibles abusos o usos arbitrarios de poder que haga el Estado, y constituye la máxima garantía de la aspirada justicia plena e imparcial". Íd. Esta protección se extiende incluso a los procedimientos de investigación criminal sobre el sospechoso de la comisión de un delito. O.E. Resumil, Práctica jurídica de Puerto Rico: Derecho procesal penal, Tomo I, Equity Pub. Co., New Hampshire, 1990, pág. 26.

Como colorario del derecho a un debido proceso de ley, la Regla 22(a) de Procedimiento Criminal, 34 L.P.R.A. Ap. II, exige que una vez se realice un arresto, la

persona arrestada deberá ser llevada ante un magistrado sin dilación innecesaria.[20] En los casos en que se realiza un arresto sin orden judicial, el propósito de este requerimiento es permitirle al magistrado evaluar la existencia de causa probable para arresto. Pueblo v. Teodoro Nolasco, 167 D.P.R. 578 (2006).

En cuanto al requisito de que este trámite se realice sin demora, en Pueblo v. Teodoro Nolasco, supra, establecimos que una vez la persona es arrestada, las autoridades deben llevarlo ante un magistrado en un periodo no mayor de 36 horas. En consecuencia, un arrestado debe comparecer ante un tribunal luego de que se completen los trámites administrativos incidentales al arresto. Por tal razón, en ausencia de razones extraordinarias, cualquier demora en exceso de ese término se presumirá irrazonable. En ese caso, aclaramos además, que esa norma tendría el efecto de establecer un periodo de tiempo máximo que puede pasar una persona en arresto sin comparecer ante un juez. No obstante, señalamos que de

---

[20] Específicamente, el texto de la Regla 22(a) de Procedimiento Criminal, 34 L.P.R.A. Ap. II señala que:

Cualquier persona que realice un arresto sin orden de arresto deberá llevar a la persona arrestada sin demora innecesaria ante el magistrado disponible más cercano, y si la persona que hiciere el arresto sin orden de arresto fuere una particular, podrá entregar a la persona arrestada a cualquier funcionario del orden público, quien a su vez deberá llevar a la persona arrestada sin demora innecesaria ante un magistrado, según se dispone en esta regla. Cuando se arrestare a una persona sin que se hubiere expedido orden de arresto y se le llevare ante un magistrado, se seguirá el procedimiento que disponen las Reglas 6 y 7, según corresponda.

existir circunstancias especiales, un periodo menor de 36 horas, puede resultar irrazonable. Íd., pág. 585.

Pasemos entonces a reseñar varios aspectos medulares relacionados con la determinación de causa probable previo al arresto.

La exigencia de causa probable para arresto se deriva de la Enmienda Cuarta de la Constitución de Estados Unidos. Esta disposición reconoce el derecho de la ciudadanía a la protección contra registros a sus personas, casas, papeles y pertenencias. Igual protección provee la Sec. 10 de nuestra Carta de Derechos, la cual estima improcedentes los registros, incautaciones y allanamientos irrazonables, salvo que exista autorización judicial basada en "causa probable apoyada en juramento o afirmación, describiendo particularmente el lugar a registrarse, y las personas a detenerse o las cosas a ocuparse." Const. E.L.A., L.P.R.A. Tomo I, ed. 2008, pág. 326. La "[e]videncia obtenida en violación a esta sección será inadmisible en los tribunales". Íd. Por consiguiente, se presume irrazonable e inválida toda incautación realizada sin orden judicial previa. Pueblo v. Serrano Reyes, 176 D.P.R. 437 (2009).

Es importante denotar que con la determinación de causa probable para arresto inicia la acción penal. Es decir, luego de la determinación de que existe causa probable para arrestar o citar una persona, esta queda

sujeta a "responder a los tribunales por la comisión de un delito". Nevares-Muñiz, op. cit., pág. 45.

De esta forma, siguiendo los parámetros constitucionales mencionados, de ordinario la determinación de causa probable debe ser hecha por un magistrado. E.L. Chiesa Aponte, Derecho procesal penal de Puerto Rico y Estados Unidos, Colombia, Ed. Forum, 1993, Vol. III, pág. 21. A esos efectos, la Regla 6 de Procedimiento Criminal estatuye que "[l]a determinación de causa probable podrá estar fundada total o parcialmente en una declaración por **información o creencia con suficiente garantía circunstancial de confiabilidad**". (Énfasis nuestro.) 34 L.P.R.A. Ap. II. En la vista de causa probable para arresto, el juzgador de los hechos debe inferir la probabilidad de que, primero, se cometió un delito y, segundo, que ese delito lo cometió esa persona. Chiesa Aponte, op. cit. pág. 29. Así pues, debemos enfatizar que el propio concepto de "causa probable" revela que no se requiere una certeza precisa y exacta sobre la ocurrencia del delito y la creencia de que el imputado lo perpetró. Véase, Herring v. United States, 555 U.S. 135 (2008). Esta determinación debe hacerse a la luz de la totalidad de las circunstancias.

Según mencionáramos, nuestra Constitución prohíbe que se pueda arrestar a una persona en ausencia de una orden judicial fundada en la determinación de causa probable. Pueblo v. Colón Bernier, 148 D.P.R. 135 (1999). El

propósito de este decreto es proteger la dignidad de las personas, al interponer la figura imparcial de un juez entre los agentes y la ciudadanía, para así dar una "mayor garantía de razonabilidad a la intrusión estatal". Íd. pág. 139; Véase, Pueblo v. Díaz, Bonano, 176 D.P.R. 601 (2009). Sin embargo, este requerimiento constitucional no es absoluto, pues cede ante la necesidad de procesar a aquellos que delinquen.

En atención a ello, nuestro esquema procesal criminal reconoce el imperativo de proveerle a los agentes del orden público las herramientas adecuadas para combatir la conducta criminal que desconcierta la paz de nuestro pueblo. Ello, claro está, sin que tal proceder conlleve la erosión de las garantías constitucionales antes esbozadas. En particular, la Regla 11 de Procedimiento Criminal enumera como excepción al mandato constitucional, las circunstancias en las que un funcionario del orden público puede realizar un arresto sin la necesidad de que medie una orden judicial previa. 34 L.P.R.A. Ap. II, R. 11.

En lo pertinente, el referido precepto, en su inciso (c), establece que un agente del orden público podrá hacer un arresto sin la orden correspondiente "[c]uando tuviere **motivos fundados** para creer que la persona que va a ser arrestada ha cometido un delito grave (felony), independientemente de que dicho delito se hubiere cometido o no en realidad. (Énfasis nuestro.) 34 L.P.R.A. Ap. II, R. 11(c).

La naturaleza y alcance de la figura de "motivos fundados" según exigidos por esta regla han sido objeto de discusión continua y análisis riguroso. Explica el profesor Chiesa que el "motivo fundado" de la Regla 11, *supra*, equivale a la "causa probable" requerida constitucionalmente bajo la Enmienda Cuarta de la Constitución federal y el Art. II Sec. 10 de la Constitución de Puerto Rico. E.L. Chiesa Aponte. Derecho procesal penal de Puerto Rico y Estados Unidos, Colombia, Ed. Forum, Vol. I, pág. 387, 1991. Comenta, pues, que esa identificación de conceptos es inevitable, ya que de otra forma, se estaría violando la norma constitucional contra arrestos irrazonables. Íd. Véase, también, Pueblo v. Calderón Díaz, 156 D.P.R. 549 (2002).

Dentro de ese marco conceptual constitucional, hemos reiterado que los motivos fundados y la causa probable para arresto son sinónimos. Pueblo v. Calderón Díaz, supra. Por consiguiente, los motivos fundados deben fundamentarse en el mínimo de información que podría convencer a un juez de que existe causa probable para arresto. Íd.

De esa forma, hemos pautado que los motivos fundados constituyen "aquella información y conocimiento que llevan a una persona ordinaria y prudente a creer que el arrestado ha cometido un delito, independientemente de que luego se establezca o no la comisión del delito". Pueblo v. Martínez Torres I, 120 D.P.R. 496 (1988).

Cónsono con ello, en Pueblo v Calderón Díaz, supra, expresamos que al hacer la determinación de si el arresto sin una orden cumple con el requisito de causa probable, el juez debe evaluar la información con la que contaba el agente que realizó el arresto, así como el cuadro fáctico que este tenía ante sí. Íd., pág. 559. En esta etapa, es necesario determinar si el agente del orden público que realizó el arresto conocía o estaba informado de hechos concretos que razonablemente apuntaran a la comisión de un delito. Íd. Es por ello que hemos intimado que meras sospechas no bastan. Íd.; Pueblo v. Colón Bernier, supra.

Nuestros pronunciamientos jurisprudenciales nos llevan a colegir que la existencia del motivo fundado se determina a base de criterios de probabilidad y razonabilidad. Pueblo v. Ruiz Bosh, 127 D.P.R. 762 (1991). Aunque las meras sospechas no bastan, al evaluar la existencia de motivos fundados al momento del arresto, no es necesario que el juez quede convencido, fuera de toda duda razonable, que se violó la ley y que la persona implicada fue la responsable de tal infracción. Pueblo v. Calderón Díaz, supra; Pueblo v. Muñoz, Colón y Ocasio, 131 D.P.R. 965 (1992).

Así, por ejemplo, en Pueblo v. Ruiz Bosh, 127 D.P.R. 762 (1991), la Policía recibió confidencias que indicaban que en horas de la noche un avión arrojaba paquetes con sustancias controladas los cuales eran recogidos por personas que esperaban en un vehículo de motor en un

cañaveral. Luego de recibir esa información, se le requirió a un agente que se personara a un accidente donde el vehículo de motor implicado contenía drogas en su interior. Encontrándose en dicho lugar, el agente fue informado que en el mismo barrio había aterrizado algún tiempo antes una avioneta, en la cual se había encontrado marihuana. Dos individuos extraños a la comunidad local fueron arrestados ese día en el área cercana al incidente. Así pues, al dirimir sobre la existencia de motivos fundados para el arresto expresamos que:

> En el ejercicio razonable del derecho, y la obligación, que tiene todo agente del orden público en nuestra jurisdicción de investigar toda querella sobre posible actividad delictiva, Pueblo v. Ortiz Martínez, 116 D.P.R. 139, 144 (1985), el agente Hernández les hizo una serie de preguntas a dichos individuos. Al inquirir sobre el lugar de donde provenían, éstos no pudieron contestar satisfactoriamente preguntas que se le hicieran a esos efectos, las contestaciones a las cuales resultaban de fácil y obligatorio conocimiento para personas residentes de la ciudad de la cual ellos originalmente alegaron provenir. **Tenemos, finalmente en cuanto a este punto en particular, que la afirmación de dichos sujetos a los efectos de que se encontraban en dicho lugar "bebiendo" era una que resultaba palpablemente falsa a la mera observación.**
> ……..
>
> En otras palabras, **somos del criterio que nada impide que la determinación que sobre 'motivos fundados' requiere el inciso (c) de la citada Regla 11 de Procedimiento Criminal, ante -- para que un funcionario pueda realizar un arresto sin orden judicial-- sea el resultado de la 'suma acumulativa' de unos hechos que, aun cuando no ocurren simultáneamente, se desarrollan o fluyen en rápida sucesión dentro de un término de tiempo relativamente corto;** en el presente caso, en un período aproximado de tres (3) horas. Resolvemos que, bajo las circunstancias específicas del caso ante nuestra consideración, el agente Hernández no venía en la obligación de acudir ante un

magistrado en busca de una orden judicial para efectuar el arresto del apelante Ruiz Bosch y el coacusado Rosario Ayala en la noche del 30 de marzo de 1982. (Énfasis nuestro.) Pueblo v. Ruiz Bosch, supra, págs. 771-72.

En sintonía con lo anterior, es imperativo puntualizar que "[e]l concepto de motivos fundados incluye tanto evidencia directa como circunstancial". D. Nevares-Muñiz, op. cit. pág. 61. Sin embargo, esta determinación no tiene que ser objeto de un análisis definido por un estándar de prueba rígido. Lo que debe existir es un conjunto de circunstancias que le permitan a una persona ordinaria y prudente inferir que se cometió un delito y que determinada persona es la responsable de tal comisión. Pueblo v. Calderón Díaz, supra; Pueblo v. Alcalá Fernández, 109 D.P.R. 326 (1980); Véase también, Illinois v. Gates, 462 U.S. 213, 231 (1983).

Es de especial importancia señalar, por otra parte, que la determinación de si hubo un arresto no está condicionada a la admisión que haga un agente sobre ello. El Tribunal Supremo Federal resolvió en Stansbury v. California, 511 U.S. 318 (1994) que al analizar si una persona está bajo custodia, es preciso utilizar un criterio objetivo. En palabras del Tribunal, "la interrogante relevante es cómo un hombre razonable, en la posición del interrogado, hubiera atendido la situación". Íd., pág. 323; Chiesa, E.L. Chiesa Aponte, Derecho Procesal Penal Etapa Investigativa, Publicaciones J.T.S.,

2006, pág. 35. Más adelante, el Tribunal Supremo federal señala:

> El conocimiento o creencias del oficial podrían tener que ver con la cuestión de custodia si son comunicados a la persona interrogada, bien por palabras o por conducta… Estas creencias son relevantes solo en la medida en que afectarían cómo una persona razonable en la posición de la persona interrogada evaluaría el alcance de su libertad de acción.
> Stansbury v. California, supra, pág. 325; Chiesa, op cit., pág. 36.

A tenor con lo anterior, hemos expresado que "una persona ha sido incautada sólo cuando a la luz de la totalidad de las circunstancias, el modelo de una *persona razonable hubiera pensado que no estaba en libertad de marcharse del lugar. Lo determinante es que la libertad del individuo haya sido efectivamente restringida.*" (Énfasis en el original.) Asoc. Ctrl. Acc. C. Maracaibo v. Cardona, 144 D.P.R. 1, 59-60 (1997), Pueblo v. Pacheco Báez, 130 D.P.R. 664, 669 (1992).

Es imperativo pautar además, que el hecho de que el agente se niegue a admitir que realizó el arresto, no implica que la información que ha recopilado hasta ese momento es insuficiente a los efectos de constituir motivos fundados para arrestar. Es decir, si a la luz de la totalidad de las circunstancias la evidencia obtenida hasta el momento del arresto da base para que: (1) un hombre ordinario y prudente crea que es probable que se cometió un delito y (2) que determinada persona fue su autor, no hay porque concluir que el arresto fue ilegal.

En otras palabras, la existencia de causa probable tampoco está condicionada a la determinación subjetiva del agente que realiza un arresto.

LaFave así lo reconoce cuando expresa que el examen a realizarse para la determinación de causa probable es uno objetivo. W. R. LaFave, <u>Search and seizure: a treatise on the Fourth Amendment</u>, 4th Ed., Vol. 2, Thomson West, pág. 35. A esos efectos y a tono con lo antes esbozado, el Tribunal Supremo de Estados Unidos enfatiza que la existencia de causa probable debe evaluarse a la luz del criterio de un hombre prudente y razonable.[21]

Cabe señalar, que puede surgir la situación de que un agente realice un arresto sin la creencia subjetiva de que tiene motivos fundados para hacerlo. LaFave, <u>op cit</u>. pág., 37. Este factor, a su vez, puede salir a relucir en una vista de supresión. Ante esta disyuntiva, LaFave señala que el hecho de que un agente no reconozca -o incluso niegue- la existencia de motivos fundados para realizar un arresto, no implica que el juzgador de los hechos no pueda determinar causa probable. Íd. Para aclarar este extremo, el tratadista cita las siguientes expresiones del Tribunal de Distrito de Pennsylvania:

---

[21] Específicamente, el Tribunal Supremo de Estados Unidos ha pautado que:

> Probable cause exists where 'the facts and circumstances within their [the officers'] trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed by [the person to be arrested].' <u>United States v. Salinas-Calderon</u>, 728 F.2d 1298, 1300 (10th Cir. 1984), citando a <u>Brinegar v. United States</u>, 338 U.S. 160, 175-76, (1949).

> [T]he mere subjective conclusions of a police officer concerning the existence of probable cause is not binding on this court which must independently scrutinize the objective facts to determine the existence of probable cause. * * * **Moreover, since the courts have never hesitated to overrule an officer's determination of probable cause when none exists, consistency suggests that a court may also find probable cause in spite of an officer's judgment that none exists.** (Énfasis nuestro.) United States ex rel. Senk v. Brierley, 381 F.Supp. 447 (1974), afirmado por el Tercer Circuito en 511 F.2d 1396 (3d Cir.), *certiorari* denegado, 423 U.S. 843 (1975).

Específicamente, allí el agente de la policía testificó que no tenía causa probable para hacer un registro. En vista de ello, dicho foro citó las siguientes expresiones:

> 'Of course we would not consider ourselves bound by a police officer's inability to articulate his conclusions if the facts clearly demonstrated the existence of probable cause…' United States ex rel. Senk v. Brierley, supra, pág. 463, citando a United States v. Day, 455 F.2d 454, 456 (3d Cir. 1972).

Por tal razón, al considerar si un arresto es válido, la intención subjetiva de un agente es un factor secundario. El único requisito es que al momento de la realización del arresto exista causa probable. Véase Washington v. State, 922 So. 2d 145 (Ala. Crim. App. 2005), citando a Carruth v. Barker, 454 So.2d 539, 540 (Ala.1984). En consecuencia, el hecho de que un agente no crea que existe causa probable no anula la posibilidad de que el Estado justifique un arresto si evidencia lo contrario. Florida v. Royer, 460 U.S. 491 (1983). En torno a ese extremo, en Florida v. Royer, supra, caso en que un oficial testificó en una moción de supresión de evidencia que no existía causa probable para un arresto, el Tribunal

Supremo federal concluyó que ello no impedía que el Estado pudiera probar que sí existía causa para arrestar. Véase, LaFave, op cit. pág. 38.

Acorde con ello, es ineludible concluir que la causa probable se mide a la luz de un estándar objetivo. Beck v. State of Ohio, 379 U.S. 89 (1964). Una vez se cumple con este estándar, resulta innecesario que el agente que hizo el arresto admita la creencia subjetiva de que tenía los motivos fundados para arrestar. Véase Cox v. State, 489 So.2d 612, 621 (Ala.Cr.App.1985),[22] United States v. Salinas-Calderon, 728 F.2d 1298, 1300-01 (10th Cir.1984). De lo anterior se colige por consiguiente, que un tribunal no está atado a las conclusiones o expresiones de un policía en lo relativo a los motivos fundados del arresto que realizó. Ello así, pues la misión del foro juzgador es evaluar la validez del arresto independientemente del criterio subjetivo del agente que lo realiza.

Lo determinante es la razonabilidad del arresto al momento que se efectuó considerando la figura del hombre

---

[22] En el contexto de la controversia que nos ocupa, resultan de particular importancia las siguientes expresiones:

The test for probable cause is clear: probable cause exists if facts and circumstances within the knowledge of an arresting officer and of which he has reasonably trustworthy information are sufficient to **warrant a man of reasonable caution in the belief that an individual has committed a crime. The facts, information and circumstances within the knowledge of the arresting officers need not amount to evidence which would suffice to convict; but the quantum of information which constitutes probable cause—evidence which would warrant a man of reasonable caution in the belief that a felony had been committed—must be measured by the facts of the particular case. The fact that the Sheriff testified that the defendant was not under arrest or in custody is not conclusive on that issue.** (Énfasis nuestro y citas internas omitidas.) Cox v. State, 489 So. 2d 612, 620-21 (Ala. Crim. App. 1985).

ordinario y prudente. Este requisito de razonabilidad del arresto que exige la Cuarta Enmienda y nuestra Constitución depende de una indagación predominantemente objetiva. Ashcroft v. al-Kidd, 131 S.Ct. 2074 (2011). Consecuentemente, luego de la evaluación objetiva de la totalidad de las circunstancias, a la luz del criterio del hombre razonable y prudente, debemos preguntarnos si existió la causa probable que justificó la acción del arresto. Íd.; Véase Scott v. United States, 436 U.S. 128,138 (1978). Por medio de este enfoque se reconoce que la Cuarta Enmienda, en lugar de escrudiñar los pensamientos de un agente, regula más bien su conducta. Ashcroft v. al-Kidd, supra. De esta forma, se promueve una aplicación imparcial de la ley. Íd.

En conjunto con todo lo antes expuesto, al momento de hacer la determinación de causa probable, debemos evitar análisis artificiosos o especializados. Citando a Brinegar v. United States, 33 U.S. 160, 175, en Pueblo v. Muñoz, Colón y Ocasio, supra, pág. 980, señalamos que:

> Cuando nos referimos a causa probable… actuamos a base de probabilidades. **Estas no son cuestiones técnicas; se trata de consideraciones prácticas y reales que surgen en la vida cotidiana a base de las cuales actúan hombres prudentes y razonables y no técnicos en derecho.** La norma o regla en cuanto a la prueba, por consiguiente, depende de la cuestión que debe probarse. (Énfasis nuestro.)

Así también, en cuanto a la interacción de este requisito con la práctica de los agentes de la policía de compartir información investigativa en un caso, hemos

precisado que "esta exigencia no impide que los agentes actúen en forma coordinada y concertada en la investigación de un crimen, de manera que sus conocimientos individuales resulten en uno colectivo y suficiente." Pueblo v. Serrano Reyes, supra, pág. 444; Pueblo v. Martínez Torres I, supra. Ello es así, debido a que de otra forma sería imposible llevar a cabo el trabajo en equipo requerido para poder combatir efectivamente la actividad criminal. Por ello, los motivos fundados de un agente, pueden ser válidamente atribuidos al funcionario del orden público a quien este primero se los transmitió. Ahora bien, es preciso que al evaluar una solicitud de supresión de evidencia, el Ministerio Público presente prueba para "establecer los motivos fundados que tuvo el agente que dio la orden o que originó la cadena de información que tuvo como resultado el arresto." Pueblo v. Serrano Reyes, supra, pág. 444.

Igualmente, es necesario puntualizar que el Ministerio Fiscal viene obligado a probar la existencia de las circunstancias que hicieron innecesaria la obtención de una orden judicial. Pueblo v. Cruz Torres, 137 D.P.R. 42,47 (1994). Consecuentemente, reafirmamos que el Estado tiene el peso de la prueba de establecer la validez y la razonabilidad de su intromisión con la libertad de los individuos. Pueblo v. Calderón Díaz, supra.

*B. Derecho contra la autoincriminación*

De otra parte, tanto nuestra Constitución como la de Estados Unidos garantizan el derecho de todo ciudadano a la no autoincriminación. Art. II, Sec. 11, Const. E.L.A., L.P.R.A., Tomo 1, Ed. 2008, pág. 343; Emda. V, Const. EE. UU., L.P.R.A. Tomo 1. Específicamente, nuestra Carta Magna dispone que "[n]adie será obligado a incriminarse por su propio testimonio y el silencio del acusado no podrá tenerse en cuenta ni comentarse en su contra". De esta forma, el derecho contra la autoincriminación, se cataloga como uno de los más trascendentales y fundamentales del derecho penal. Pueblo v. Viruet Camacho, 173 D.P.R. 563 (2008).

Igualmente, es norma hartamente conocida que cuando una investigación realizada por los agentes del orden público se centraliza sobre un ciudadano que está bajo su custodia, el Estado está obligado a advertirle sobre los derechos que le asisten constitucionalmente contra la autoincriminación y su derecho a ser asistido por un abogado. Pueblo v. Millán Pacheco, 182 D.P.R. 595 (2011); Miranda v. Arizona, 384 U.S. 436 (1966). Concretamente, es necesario que se le comunique al sospechoso que tiene derecho a guardar silencio, que cualquier declaración que haga podrá y será usada en su contra y que tiene derecho a ser asistido por un abogado contratado por él o por el Estado, si la persona no cuenta con recursos económicos. Id.

Sin embargo, hemos reiterado que este privilegio de rango constitucional es renunciable. Pueblo v. Fernández Rodríguez, 183 D.P.R. 770 (2011). Es necesario que tal renuncia se realice de forma voluntaria, consciente e inteligente. Íd. Así pues, hemos expresado que para que una renuncia sea voluntaria se debe haber realizado "'sin que haya mediado intimidación, coacción o violencia por parte de los funcionarios del Estado en el procedimiento que culmina en la toma de la confesión'". Íd., pág. 789, citando a Pueblo v. Ruiz Bosch, 127 D.P.R. 762, 775 (1991). En consecuencia, "para que se entienda renunciado un privilegio su dueño o poseedor debe ser advertido o informado por las autoridades pertinentes de su derecho al privilegio y de la existencia del mismo". Pueblo v. Fernández Rodríguez, supra pág. 789. Véase Pueblo v. Millán Pacheco, supra.

En torno a ese particular, para que un tribunal determine la validez de la renuncia a la luz de la totalidad de las circunstancias, el Ministerio Público debe presentar prueba tendente a demostrar cuáles fueron las advertencias que se realizaron y las circunstancias en las que el sospechoso hizo la confesión o la admisión. Pueblo v. Viruet Camacho, supra.

Por otro lado, es preciso apuntar, además, lo que constituye una confesión y admisión para los efectos del derecho contra la autoincriminación. Conocemos que la confesión es aquella manifestación oral o escrita de la

comisión del delito. Nevares-Muñiz, op. cit., pág. 36. Ello incluye la referencia al acto en sí y a todos sus elementos. Mientras, la admisión es una "manifestación sobre un hecho específico o un eslabón de la prueba que tiende a establecer la culpabilidad del acusado". Íd. Comenta la profesora Nevares Muñiz que la admisión se distingue de la confesión en cuanto se refiere a cuestiones de hecho que no reflejan una culpabilidad completa. Íd. La confesión, en vez, constituye el reconocimiento extrajudicial de culpabilidad que incluye aceptar la comisión de todos los elementos del delito. Íd.; Pueblo v. Viruet Camacho, supra.

Definidos los conceptos constitucionales y jurisprudenciales sobre el arresto, la exclusión de evidencia y la autoincriminación, pasemos a resolver la controversia que hoy nos ocupa.

### III

El Ministerio Público aduce que el Tribunal de Apelaciones incurrió en error de derecho al determinar que la intervención de los agentes con el señor Pérez Rivera fue ilegal. Somos del criterio que le asiste la razón al Estado. Veamos.

A. *Validez del arresto*

Como mencionáramos antes, la conclusión de si hubo un arresto válido, no depende de la admisión del agente que lo realiza, sino del análisis objetivo de todas las circunstancias que rodearon el mismo.

En el caso de autos, aunque el agente Grau no reconoció que realizó un arresto, debemos colegir que sí lo hizo. Ello, en el momento en que ordenó el traslado del recurrido al cuartel de la Policía. Esta conclusión se apoya además sobre el hecho de que no se le comunicó al recurrido que no tenía la obligación de ir con la Policía. Así también, debemos resaltar el factor de que no le acompañó ningún familiar. Incluso, en el expediente nada refleja que el recurrido estuviera en la libertad de marcharse. Todo lo contrario, pasó la noche en una celda en Arecibo. Ahora bien, concluido que en efecto hubo un arresto, debemos determinar si fue legal. Veamos.

Del testimonio del agente Grau surge que el 31 de diciembre de 2009 estaba investigando una escena donde había un cadáver con heridas cortantes en las manos y en otras partes del cuerpo. **En ese momento, el agente razonablemente entendía que se trataba de la escena de un asesinato.** Posteriormente, durante su investigación, el hermano del occiso **le informó que el señor Pérez Rivera tenía que estar involucrado en lo que le había ocurrido a la víctima y que sentía temor.** Ello así, porque habían ocurrido incidentes previos entre el señor Vázquez Sánchez y el acusado.[23]

Añádasele a lo anterior, que según se le informó al agente Grau, el señor Pérez Rivera fue quien alertó sobre

---

[23] Transcripción estipulada de la prueba, Apéndice del recurso de *certiorari*, págs. 155-156.

la situación de que había una persona muerta. Es decir, sin que nadie más estuviera en conocimiento de que ocurrió un delito, el recurrido ya conocía del mismo. En relación a esto, el agente indicó además, que **el acusado fue inconsistente al indicarle que había visto manchas de sangre en la puerta desde un lugar en el que el agente corroboró que no podían observarse.[24] Desde ese momento, el agente Grau tenía propio y personal conocimiento de que el acusado estaba mintiendo sobre información relacionada a la escena del crimen.** Ante estos hechos, no podemos esperar que un hombre prudente y razonable no llegara a inferencias lógicas y razonables, y creyera lo que nadie más estuviera dispuesto a creer bajo las mismas circunstancias. **No se trata pues, de una mera sospecha infundada e insustancial, sino de una suma de circunstancias a las que un agente investigador tiene la responsabilidad de dar seguimiento.** Es decir, el agente pudo observar el comportamiento sospechoso del señor Pérez Rivera. Además, en esa etapa contaba con los datos provistos por el hermano del occiso sobre los incidentes previos entre la víctima y el recurrido.

Los hechos de este caso son similares a los de Pueblo v. Alcalá Fernández, supra, donde la reacción espontánea de los testigos fue señalar exclusivamente al acusado como autor del crimen. Es pertinente apuntar, que según pautamos en Alcalá, supra, al realizar un arresto sin

---

[24] Íd.

orden lo vital es que exista un conjunto de circunstancias cuyo conocimiento constituya motivo fundado para que una persona corriente y razonable crea que el sospechoso cometió el acto delictivo. Es evidente que de la información producto de su investigación, el agente Grau tenía ante sí hechos concretos que apuntaban al acusado como autor de los hechos. En vista de lo anterior, es forzoso colegir que el agente Grau no tenía ante sí meras sospechas.

La suma de todas estas circunstancias, sin lugar a dudas, establece en la mente de cualquier persona corriente y razonable un escenario de la comisión de delito en el que el acusado probablemente estaba involucrado. En consecuencia, la intervención con el recurrido fue razonable y estuvo revestida de las garantías constitucionales antes discutidas.

Por su parte, la determinación del Tribunal de Apelaciones en relación a la ilegalidad del arresto se basó en el raciocinio de Pueblo v. Colón Bernier, supra, de que las meras sospechas no son suficientes para establecer los motivos fundados que justifican el arresto sin orden judicial. Sin embargo, los hechos de ese caso son muy distintos a la controversia que hoy nos ocupa. Se trataba allí de una confidencia de un evento delictivo próximo a ocurrir. No se relacionaba de manera alguna a las personas apuntadas en la comisión de un delito. Más bien, la información que llegó al agente se refería

únicamente a la presencia en un área residencial de unos individuos sospechosos. Por consiguiente, opinamos en aquel entonces que el arresto que ocurrió en Colón Bernier, supra, se fundó en una simple conjetura.

Esa "mera sospecha" rechazada en Colón Bernier, supra, está ausente en el caso objeto de nuestro análisis. Hoy encaramos unos hechos en lo que funcionarios del orden público tenían certeza de que ocurrió un delito grave, pues se encontró un cadáver con evidentes signos de violencia. Así también, de la investigación realizada por los agentes se develó una suma de circunstancias que apuntaron al recurrido como autor del mismo. No se trata aquí de circunstancias generales, sino de información concreta e individualizada de los hechos de la comisión de un asesinato y de la implicación de un individuo como el autor del mismo.

Insistimos y es meritorio descollar el hecho de que el recurrido proveyó información desacertada y palpablemente falsa como respuesta a las preguntas del agente Grau. El comportamiento sospechoso del acusado, sumado al hecho de que ocurrió una muerte violenta y las indicaciones del hermano y el cuñado del occiso, son circunstancias suficientes para sostener la probabilidad razonable de que el acusado fue el autor del asesinato del señor Vázquez Sánchez.

Es incuestionable, a la luz de la totalidad de las circunstancias que los agentes del orden público tenían

motivos fundados para realizar el arresto sin orden judicial. Reiteramos que el estándar para medir la causa probable para justificar un arresto es el de una persona "prudente y ordinaria".[25] Sin lugar a dudas, ante este estándar y la información producto de la investigación previa, para una persona común era probable que el recurrido estuviera involucrado directamente con los hechos delictivos. En consecuencia, la actuación de la Policía de arrestar al recurrido en ese momento estuvo ampliamente justificada. Es evidente que conforme los criterios establecidos en la Regla 11 de Procedimiento Criminal, *supra*, existían los motivos fundados para convalidar el arresto sin una orden judicial; ello incluso antes del interrogatorio realizado por el sargento Pérez.

Cónsono con lo expuesto, ante la pregunta de si un hombre ordinario y prudente, a la luz de toda esta información puede razonablemente creer que el recurrido asesinó al señor Sánchez Vázquez, no queda otra respuesta que la afirmativa: los motivos fundados estaban presentes previo al arresto. El que el agente Grau no admitiera que

---

[25] Resultan de particular relevancia las siguientes expresiones emitidas por el Tribunal Superior del estado de New Jersey:

Probable cause is defined as a reasonable basis for a belief that a crime **has been or is being committed.** Probable cause is a mercurial concept incapable of precise definition. **"It is more than mere naked suspicion but less than the legal evidence necessary to convict... it is not a technical concept but rather one having to do with 'the factual and practical considerations of everyday life' upon which reasonable men, not constitutional lawyers, act."** (Citas internas omitidas y énfasis nuestro.) State v. Gavazzi, 332 N.J. Super. 348, 354, 753 A.2d 746, 750 (Ch. Div. 2000).

hizo un arresto, no invalida la palmaria existencia de causa probable para el arresto del señor Pérez Rivera. Recordemos pues, que la determinación de si hubo motivos fundados para arrestar sin previa orden judicial, no está condicionada a la creencia subjetiva del oficial que lo realizó. Las conclusiones personales del agente Grau sobre que no arrestó al recurrido y de que más bien lo dejó bajo custodia para su protección no nos atan, ni nos obligan a concluir que: no hubo arresto y que no existían motivos fundados para hacer el arresto. LaFave, _op cit_. pág. 37. Ello pues, precisamente, es función del juzgador aquilatar y hacer un análisis independiente de los hechos para llegar a su propia determinación sobre la existencia de causa probable.

En atención a los antecedentes fácticos, opinamos que el arresto fue uno razonable y que cumplió con los parámetros constitucionales. Ello, pues, no se trataba aquí de una mera sospecha, sino de un conjunto de circunstancias que permitieron que los agentes del orden público creyeran que el señor Pérez Rivera le había causado la muerte a la víctima. Según indicamos, el punto de partida fue el descubrimiento del cuerpo sin vida del señor Vázquez Sánchez. A ello se le sumó el producto de la investigación de los agentes en términos de que el recurrido merodeaba la casa del occiso y que tenía problemas con este, más la versión inverosímil que el recurrido ofreció a Grau con respecto al incidente.

Los agentes de la Policía son los funcionarios responsables de realizar distintas labores de seguridad pública y en el área de investigación criminal. Somos del criterio que son personas que pueden razonable y naturalmente inferir conclusiones sobre la cadena de evidencia que recopilan en una investigación. Añadámosle a esto, que el estándar de causa probable para arresto, según hemos establecido, no requiere **certeza más allá de duda razonable** de que se cometió un delito ni de que el imputado fue quien lo cometió.

Ante los hechos que hoy escrutamos, tanto el agente Grau como el sargento Pérez podían razonablemente colegir que primero, hubo un asesinato y, segundo, que probablemente el recurrido estuvo vinculado con los hechos delictivos. Por ello, el segundo no dudó en admitir que sí había ocurrido un arresto. En este análisis sería absurdo requerirles a los funcionarios del orden público que realicen arrestos únicamente cuando hayan presenciado la comisión de un delito o cuando tengan la certeza indudable de su comisión y de quién es su autor. Tal proceder sería derogar de facto la Regla 11(c) de Procedimiento Criminal, *supra*.

Colegimos, pues, que la determinación de lo que constituye causa probable como hemos reiterado a lo largo de nuestra jurisprudencia se basa en las creencias que razonablemente pueda tener una persona "ordinaria y prudente". Es necesario llevar este estándar a la

práctica, abandonando así la posibilidad de abstraernos de la realidad que tuvo ante sí el funcionario público que realizó el arresto.

*B. Voluntariedad de la información provista sobre la ubicación del arma homicida y de la confesión*

En la vista celebrada para determinar la procedencia de la supresión de evidencia, incluyendo las declaraciones del acusado el 31 de diciembre de 2009, el Ministerio Público presentó prueba testifical y documental en torno a las circunstancias que rodearon la misma. Según declaró el sargento Pérez, en esa fecha al acusado se le hicieron las advertencias legales correspondientes antes de prestar su declaración. Esto es, se le advirtió de su derecho a no declarar, de su derecho a la asistencia de un abogado, la cual sería costeada por el Estado en caso de que no pudiera costearla y de que su declaración tenía que ser voluntaria. Asimismo, se le advirtió que en cualquier momento podía dejar de declarar y que todo lo que dijera podía ser usado en su contra. Fue luego de recibir las advertencias de ley que el señor Pérez Rivera procedió a dar su versión de los hechos en la que incriminó a un tercero, conocido por "Chapo", y reveló la ubicación del arma homicida.

Podemos colegir razonablemente que el acusado no ubicó el arma homicida movido por un sentimiento de

compulsión proveniente de una detención ilegal. Más bien, ello fue producto de un acto voluntario.[26]

Así también, del legajo de autos se desprende igualmente que el sargento Pérez le hizo al recurrido las advertencias de rigor en varias ocasiones posteriores: antes de tomarle las huellas dactilares y antes de que el recurrido comenzara a hacer su confesión incriminatoria. Nuevamente, cuando se le va a tomar la declaración jurada, el Estado le hace las advertencias legales. La defensa alega que como el recurrido no sabía leer, tenía dieciocho años, y, supuestamente, tenía un coeficiente intelectual inferior porque no sabía su número de seguro social ni su fecha de nacimiento, este no podía entender los derechos que le fueron informados. No podemos avalar esas alegaciones. Es norma reiterada en nuestro ordenamiento jurídico que las meras alegaciones no constituyen prueba.

Primero, debemos aclarar que las manifestaciones que el recurrido realizó el 31 de diciembre de 2009 en el interrogatorio que le hizo el sargento Pérez, no constituyeron una confesión o admisión. El recurrido tuvo la suspicacia en ese momento de no incriminarse. Más bien, el recurrido involucró a un tercero y proveyó la información de que conocía donde estaba el arma homicida. El testimonio el sargento Pérez en torno a ese extremo expresa que:

---

[26] Véase U.S. v. Stark, 499 F.3d.72 (2007).

Fiscal: ¿Qué más le indicó?

Sargento: El me indicó que esa muerte la había ocasionado un muchacho allí mismo del barrio conocido como Chapo. Que Chapo le había indicado que había sido él. Pero que no…

Fiscal: Disculpe.

Sargento: Pero sí, pero que a su vez, perdón Chapo le había manifestado que no le comentara a nadie que no lo chotiara [sic] por que si no él lo iba a matar. Él a su vez me indicó que él había visto a Chapo, eso viene siendo un poquito más arriba de la residencia…

Fiscal: ¿Qué alguna otra cosa le informó o que le indicó en ese momento de esa entrevista?

Sargento: Este, pues que si él estaba seguro de lo que me estaba indicando y el me indicó que si él sabía a su vez que donde estaba el arma que se utilizó en ese asesinato. Él me indicó que esa arma se había utilizado, el cuchillo estaba en la parte posterior cerca de otra residencia cerca de unas matas de plátano. **Y que él estaba dispuesto a llevarme al lugar donde estaba.** Durante esa noche nosotros pasamos al lugar pero de acuerdo a las condiciones del tiempo, el tiempo lluvioso la búsqueda como tal del arma utilizada se tuvo que suspender y al día siguiente volvimos con él… (Énfasis nuestro.) Transcripción de la prueba estipulada, Apéndice del recurso de *certiorari*, pág. 169.

Las manifestaciones incriminatorias se realizaron el 4 de enero de 2010, cuando el recurrido fue citado y asistió voluntariamente a que le tomaran sus huellas dactilares.[27] Luego que se las tomaron, este espontáneamente decidió confesar su delito. En esos instantes se le vuelven a realizar las advertencias *Miranda* y se le dio un documento para que confirmara que había sido informado sobre ello.

---

[27] Transcripción estipulada de la prueba, Apéndice del recurso de *certiorari*, pág. 172.

El derecho a la autoincriminación, según enfatizamos, es renunciable. Ello así, siempre que tal renuncia sea inteligente y voluntaria, y no medie coacción o violencia por parte de los funcionarios del Estado. En este caso, la mera alegación de que el recurrido tenía un coeficiente intelectual menor, no da base para concluir que este no comprendió las advertencias que le fueron comunicadas en varias ocasiones. Es preciso mencionar que el señor Pérez Rivera fue declarado procesable para atender a los rigores del proceso criminal.[28] Además, su astucia al apagar los "breakers" de la casa de su víctima para que nadie lo viera, según confesó en su declaración jurada, revela que es una persona de sentido común promedio. Es forzoso deducir que no estamos aquí ante una persona sin malicia e incapaz de comprender las consecuencias de sus acciones ni de la renuncia a sus derechos.

Asimismo, de la prueba vertida, la cual en su alegato la parte recurrida reconoce que el Tribunal de Primera Instancia creyó en su totalidad, surge que en todo momento el recurrido se sintió cómodo y no fue coaccionado ni amedrentado por los funcionarios del orden público para obtener información alguna. Este declaró que lo habían tratado muy bien y que estaba tranquilo al momento de su confesión, la cual realizó voluntariamente.[29]

---

[28] Véase Apéndice del recurso de *certiorari*, pág. 61.
[29] Íd., pág. 70.

Resultan de particular importancia las expresiones del recurrido en torno a lo que manifestó a la Policía el 31 de diciembre de 2009:

¿El 31 de diciembre de 2009, qué Agente de Homicidios lo entrevistó a usted?
Un agente bajito, fuerte, calvo. Él me hizo las advertencias de ley y me preguntó qué pasó. Yo le dije que había sido Chapo, que salió de la casa abandonada del cruce. Que tenía un pantalón Brown y una camisa blanca y que la camisa blanca estaba llena de sangre y las manos también. Le dije que yo no tenía nada que ver con la muerte de Moncho, que yo llegué a mi casa temprano, a las 9 de la noche y que me acosté a dormir con mi esposa. Que como a las 10 me desperté porque escuché a los perros ladrar. … **Yo le dije al agente que yo sabía donde estaba el cuchillo y al otro día los llevé, al sitio y encontraron el cuchillo donde yo les había indicado.** En el día de hoy volvía a hablar con el agente de homicidios en el cuartel de Morovis donde yo estaba citado y allí me leyeron las advertencias nuevamente y le dije la verdad. Yo iba asustado y quería sacarme eso ya.

Lo que usted ha declarado en la tarde de hoy, ¿le pregunto si usted se reafirma en que es cierto?
Sí

¿Cómo lo ha tratado la Policía>
Súper bien, demasiado cariñosos.

¿Cómo lo ha tratado el fiscal?
Bien también.

¿Esta declaración que usted ha hecho hoy es libre y voluntaria?
Sí.

¿Alguien le ha ofrecido algo a cambio de que usted declare aquí?
No.

Declaración Jurada del 4 de enero de 2010, Apéndice del recurso de *certiorari,* pág. 67.

Evaluada la totalidad de las circunstancias, la cantidad de veces que se le advirtieron sus derechos

constitucionales, la actitud de colaboración en la búsqueda del cuchillo y la posterior confesión, concluimos que el recurrido renunció inteligentemente a su derecho contra la autoincriminación.

Según surge de la transcripción de la vista de supresión, el recurrido fue liberado el 1 de enero de 2010. La defensa plantea en su alegato que el término de 36 horas establecido en Pueblo v. Teodoro Nolasco, supra, es para llevar a una persona arrestada sin una orden judicial ante un magistrado para que determine si existe o no causa probable y no para investigar o buscar evidencia contra el sospechoso. En relación a este extremo, opinamos que no hay obstáculo para que los agentes del orden público -como en este caso- una vez tienen motivos fundados para arrestar a un individuo, así lo hagan. Más aún cuando el recurrido quiso indicar el paradero del arma utilizada en la comisión del delito y prestó su disponibilidad para buscarla.[30] Debemos destacar, que mucho antes de recibir esa información de parte del recurrido, el Estado ya tenía motivos fundados para arrestarlo. Igualmente, es preciso puntualizar que el señor Pérez Rivera no estuvo más de 36 horas arrestado.

---

[30] Distinguimos los hechos de las expresiones de County of Riverside v. McLaughlin, 500 U.S. 44, 57 (1991), donde se indicó que un ejemplo de una demora irrazonable es en la que se incurre para recopilar evidencia adicional que justifique el arresto. En los hechos ante nuestra consideración, el arresto se justificó en sus inicios. La obtención del cuchillo no era necesaria para justificar el arresto. Más bien, el recurrido quiso indicar donde estaba el arma y voluntariamente llevar a los agentes del orden público a encontrarla. Además, el recurrido fue liberado antes de que se cumpliera el término de 36 horas adoptado en Pueblo v. Teodoro Nolasco, 167 D.P.R. 578 (2006) y luego fue citado para que compareciera a la toma de huellas digitales el 4 de enero de 2010.

No podemos concluir que el arresto realizado fue una detención ilegal para la investigación. Según analizamos, la detención fue legal, pues fue propiciada por la existencia de motivos fundados. Además, los agentes de la Policía tienen la potestad de llevar a cabo sus investigaciones, con o sin la colaboración del detenido.

En este caso, el recurrido quiso colaborar con la obtención de la evidencia. Una vez delineados los límites procesales de índole constitucional, nada impide que el Estado vaya tras la evidencia que el sospechoso de la comisión del delito indica. Hacemos hincapié, además, que en ningún momento se sometió al recurrido a un interrogatorio continuo que quebrara su voluntad. Tanto fue así, que este no confesó en ese momento y solo quiso voluntariamente indicar dónde estaba el arma.

Establecido que el arresto fue legal y que todas las manifestaciones posteriores al arresto fueron voluntarias, concluimos que la regla de exclusión de evidencia es inaplicable en este caso. En consecuencia, resuelto que el arresto fue legal, es innecesaria la discusión de la doctrina atinente a la exclusión de evidencia. El arresto fue razonable y, por consiguiente, el arma obtenida por medio de las manifestaciones vertidas tras el arresto es admisible por no ser fruto del árbol ponzoñoso.

Más que sustituir el criterio del juez de instancia, en el día de hoy tenemos presente que al revisar una determinación de causa probable nos corresponde "estimar si

la evidencia considerada en su totalidad proveía una **base sustancial para la determinación de causa probable**". (Énfasis nuestro.) <u>Pueblo v. Muñoz, Colón y Ocasio</u>, supra, pág. 984. En la realización de esa tarea, es preciso mantener en perspectiva, como reiteramos hoy, que la determinación de causa probable conlleva un análisis de probabilidad y no de certeza. "Estas no son cuestiones técnicas; se trata de consideraciones prácticas y reales que surgen en la vida cotidiana a base de las cuales actúan hombres prudentes y razonables y no técnicos en derecho." (Énfasis suprimido.) Íd., págs. 979-980.

A la luz de todo lo anterior, es improcedente pretender elevar el criterio de razonabilidad y probabilidad a uno de certeza absoluta. De lo contrario, tal proceder, atentaría contra la efectiva persecución de la actividad criminal a la que nuestro pueblo aspira.

IV

Por los fundamentos que anteceden, modificamos la sentencia del Tribunal de Apelaciones y resolvemos que el arresto del señor Pérez Rivera realizado el 31 de diciembre de 2009 cumplió con los parámetros constitucionales que rigen el estado de derecho. En consecuencia, se revoca la parte del dictamen del foro apelativo intermedio que suprimió el arma homicida. Por otro lado, confirmamos el foro *a quo* en cuanto a la determinación de que la confesión realizada el 4 de enero

de 2010 y las expresiones del recurrido al agente Grau el 31 de diciembre de 2009 no deben ser suprimidas puesto que fueron prestadas de forma libre, inteligente y voluntaria. Asimismo, ordenamos la devolución del expediente de autos al foro primario para que continúe con los procedimientos judiciales conforme a lo aquí resuelto.

Se dictará Sentencia de conformidad.


                              EDGARDO RIVERA GARCÍA
                              JUEZ ASOCIADO

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


El Pueblo de Puerto Rico                    Certiorari

    Peticionario
                            CC-2011-0131
       v.

Mairo Pérez Rivera

    Recurrido




SENTENCIA


En San Juan, Puerto Rico, a 26 de septiembre de 2012.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, modificamos la sentencia del Tribunal de Apelaciones y resolvemos que el arresto del señor Pérez Rivera realizado el 31 de diciembre de 2009 cumplió con los parámetros constitucionales que rigen el estado de derecho. Consiguientemente, revocamos la parte del dictamen del foro apelativo intermedio que suprimió el arma homicida. De otra parte, confirmamos el foro *a quo* en cuanto a la determinación de que la confesión realizada el 4 de enero de 2010 y las expresiones del recurrido al agente Grau el 31 de diciembre de 2009 no deben ser suprimidas puesto que fueron prestadas de forma libre, inteligente y voluntaria. Asimismo, ordenamos la devolución del expediente de autos al Tribunal de Primera Instancia para la continuación de los procedimientos según lo aquí resuelto.

Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Presidente señor Hernández Denton y la Jueza Asociada señora Fiol Matta disienten sin opinión escrita. La Juez Asociada señora Rodríguez

Rodríguez disiente de la Opinión del Tribunal por entender que el arresto sin orden del señor Mairo Pérez Rivera fue ilegal. A diferencia del criterio mayoritario, la Juez Asociada entiende que los agentes del orden público no tenían motivos fundados para arrestar al señor Mairo Pérez Rivera. Debemos recordar que "[e]l concepto de motivos fundados se ha definido como aquella información y conocimiento que llevan a una persona ordinaria y prudente a creer que el arrestado ha cometido un delito". *Pueblo v. Martínez Torres*, 120 D.P.R. 496 (1988). Del testimonio brindado que el hermano de la víctima afirmó que el señor Pérez Rivera podía haberle hecho algo, que el occiso y el señor Pérez Rivera habían tenido un problema anterior y que le pareció raro que el señor Pérez Rivera hubiese visto unas gotas de sangre a una distancia que, según alega el agente, no se podían ver. Sin embargo, a preguntas sobre si se arrestó o no al señor Pérez Rivera el agente contestó que no. Aclaró que ordenó que lo trasladaran al destacamento por motivos de seguridad.

Anteriormente hemos dicho que una persona está arrestada cuando está restringida de su libertad. Además, hemos expresado que el arresto no depende de que el agente le haya comunicado al arrestado la intención de detenerle. En este sentido, la determinación de si una persona está o no bajo arresto debe realizarse mediante un análisis objetivo de la totalidad de las circunstancias. *El Pueblo de Puerto Rico v. Herminio Pacheco Báez*, 130 D.P.R. 664 (1992).

No hay duda que al analizarse objetivamente las circunstancias que rodearon la detención del señor Pérez Rivera, este estaba bajo arresto. No obstante, este arresto fue ilegal porque, según el testimonio del agente que ordenó el mismo, el único motivo de la detención fue salvaguardar la seguridad del señor Pérez Rivera. De esta manera, es forzoso concluir que al arresto ser ilegal, procede suprimir la evidencia producto de la actuación ilegal del Estado.

                              Aida Ileana Oquendo Graulau
                              Secretaria del Tribunal Supremo